# WAYTE *v.* UNITED STATES

No. 83–1292.   Argued November 6, 1984—Decided March 19, 1985

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, REHNQUIST, STEVENS, and O'CONNOR, JJ.,

joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post,* p. 614.

*Mark D. Rosenbaum* argued the cause for petitioner. With him on the briefs were *Dan Stormer, Mary Ellen Gale, Dennis M. Perluss, Dan Marmalefsky, Laurence H. Tribe, William G. Smith,* and *Burt Neuborne.*

*Solicitor General Lee* argued the cause for the United States. With him on the brief were *Assistant Attorney General Trott, Deputy Solicitor General Frey, Mark I. Levy,* and *John F. De Pue.**

JUSTICE POWELL delivered the opinion of the Court.

The question presented is whether a passive enforcement policy under which the Government prosecutes only those who report themselves as having violated the law, or who are reported by others, violates the First and Fifth Amendments.

I

On July 2, 1980, pursuant to his authority under § 3 of the Military Selective Service Act, 62 Stat. 605, as amended, 50 U. S. C. App. § 453,[1] the President issued Presidential Proc-

---

*Dennis E. Curtis* filed a brief for the Central Committee for Conscientious Objectors et al. as *amici curiae* urging reversal.

*David Crump* filed a brief for the Legal Foundation of America as *amicus curiae* urging affirmance.

[1] Section 3 provides in pertinent part:

"[I]t shall be the duty of every male citizen of the United States, and every other male person residing in the United States, who, on the day or days fixed for the first or any subsequent registration, is between the ages of eighteen and twenty-six, to present himself for and submit to registration at such time or times and place or places, and in such manner, as shall be determined by proclamation of the President and by rules and regulations prescribed hereunder."

The United States requires only that young men *register* for military service while most other major countries of the world require actual service. The International Institute for Strategic Studies, The Military Balance 1983–1984 (1983); see *Selective Service System* v. *Minnesota Public Service Research Group,* 468 U. S. 841, 860, n. 2 (1984) (POWELL, J., concurring in part and concurring in judgment).

lamation No. 4771, 3 CFR 82 (1981). This Proclamation directed male citizens and certain male residents born during 1960 to register with the Selective Service System during the week of July 21, 1980. Petitioner fell within that class but did not register. Instead, he wrote several letters to Government officials, including the President, stating that he had not registered and did not intend to do so.[2]

Petitioner's letters were added to a Selective Service file of young men who advised that they had failed to register or who were reported by others as having failed to register. For reasons we discuss, *infra*, at 612–613, Selective Service adopted a policy of passive enforcement under which it would investigate and prosecute only the cases of nonregistration contained in this file. In furtherance of this policy, Selective Service sent a letter on June 17, 1981, to each reported violator who had not registered and for whom it had an address.

---

[2] On August 4, 1980, for example, petitioner wrote to both the President and the Selective Service System. In his letter to the President, he stated:

"I decided to obey my conscience rather than your law. I did not register for your draft. I will never register for your draft. Nor will I ever cooperate with yours or any other military system, despite the laws I might break or the consequences which may befall me." App. 714.

In his letter to the Selective Service System, he similarly stated: "I have not registered for the draft. I plan never to register. I realize the possible consequences of my action, and I accept them." *Id.*, at 716.

Six months later, petitioner sent a second letter to Selective Service:

"Last August I wrote to inform you of my intention not to register for the draft. Well, I did not register, and still plan never to do so, but thus far I have received no reply to my letter, much less any news about your much-threatened prosecutions.

"I must interpret your silence as meaning that you are too busy or disorganized to respond to letters or keep track of us draft-age youth. So I will keep you posted of my whereabouts." *Id.*, at 710.

He also stated that, although he would "be traveling the nation . . . encouraging resistance and spreading the word about peace and disarmament," he could be reached at his home address in Pasadena, California. *Id.*, at 710–711.

The letter explained the duty to register, stated that Selective Service had information that the person was required to register but had not done so, requested that he either comply with the law by filling out an enclosed registration card or explain why he was not subject to registration, and warned that a violation could result in criminal prosecution and specified penalties. Petitioner received a copy of this letter but did not respond.

On July 20, 1981, Selective Service transmitted to the Department of Justice, for investigation and potential prosecution, the names of petitioner and 133 other young men identified under its passive enforcement system—all of whom had not registered in response to the Service's June letter. At two later dates, it referred the names of 152 more young men similarly identified. After screening out the names of those who appeared not to be in the class required to register, the Department of Justice referred the remaining names to the Federal Bureau of Investigation for additional inquiry and to the United States Attorneys for the districts in which the nonregistrants resided. Petitioner's name was one of those referred.

Pursuant to Department of Justice policy, those referred were not immediately prosecuted. Instead, the appropriate United States Attorney was required to notify identified nonregistrants by registered mail that, unless they registered within a specified time, prosecution would be considered. In addition, an FBI agent was usually sent to interview the nonregistrant before prosecution was instituted. This effort to persuade nonregistrants to change their minds became known as the "beg" policy. Under it, young men who registered late were not prosecuted, while those who never registered were investigated further by the Government. Pursuant to the "beg" policy, the United States Attorney for the Central District of California sent petitioner a letter on October 15, 1981, urging him to register or face possible prosecution. Again petitioner failed to respond.

On December 9, 1981, the Department of Justice instructed all United States Attorneys not to begin seeking indictments against nonregistrants until further notice. On January 7, 1982, the President announced a grace period to afford nonregistrants a further opportunity to register without penalty. This grace period extended until February 28, 1982. Petitioner still did not register.

Over the next few months, the Department decided to begin prosecuting those young men who, despite the grace period and "beg" policy, continued to refuse to register. It recognized that under the passive enforcement system those prosecuted were "liable to be vocal proponents of nonregistration" or persons "with religious or moral objections." Memorandum of March 17, 1982, from Lawrence Lippe, Chief, General Litigation and Legal Advice Section, Criminal Division, Department of Justice, to D. Lowell Jensen, Assistant Attorney General, Criminal Division, App. 301. It also recognized that prosecutions would "undoubtedly result in allegations that the [case was] brought in retribution for the nonregistrant's exercise of his first amendment rights." *Ibid.* The Department was advised, however, that Selective Service could not develop a more "active" enforcement system for quite some time. See *infra,* at 613. Because of this, the Department decided to begin seeking indictments under the passive system without further delay. On May 21, 1982, United States Attorneys were notified to begin prosecution of nonregistrants. On June 28, 1982, FBI agents interviewed petitioner, and he continued to refuse to register. Accordingly, on July 22, 1982, an indictment was returned against him for knowingly and willfully failing to register with the Selective Service in violation of §§ 3 and 12(a) of the Military Selective Service Act, 62 Stat. 605 and 622, as amended, 50 U. S. C. App. §§ 453 and 462(a). This was one of the first indictments returned against any individual under the passive policy.

## II

Petitioner moved to dismiss the indictment on the ground of selective prosecution. He contended that he and the other indicted nonregistrants[3] were "vocal" opponents of the registration program who had been impermissibly targeted (out of an estimated 674,000 nonregistrants[4]) for prosecution on the basis of their exercise of First Amendment rights. After a hearing, the District Court for the Central District of California granted petitioner's broad request for discovery and directed the Government to produce certain documents and make certain officials available to testify. The Government produced some documents and agreed to make some Government officials available but, citing executive privilege, it withheld other documents and testimony. On October 29, 1982, the District Court ordered the Government to produce the disputed documents and witness. The Government declined to comply and on November 5, 1982, asked the District Court to dismiss the indictment in order to allow an appeal challenging the discovery order. Petitioner asked for dismissal on several grounds, including discriminatory prosecution.

On November 15, 1982, the District Court dismissed the indictment on the ground that the Government had failed to

---

[3] The record indicates that only 13 of the 286 young men Selective Service referred to the Department of Justice had been indicted at the time the District Court considered this case. As of March 31, 1984, three more men had been indicted. The approximately 270 not indicted either registered, were found not to be subject to registration requirements, could not be found, or were under continuing investigation. The record does not indicate how many fell into each category.

[4] On July 28, 1982, Selective Service stated that 8,365,000 young men had registered out of the estimated 9,039,000 who were required to do so. Selective Service Prosecutions: Oversight Hearing before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 97th Cong., 2d Sess., 10 (1982). This amounted to a nonregistration rate of approximately 7.5 percent.

rebut petitioner's prima facie case of selective prosecution.[5] Following precedents of the Court of Appeals for the Ninth Circuit, the District Court found that in order to establish a prima facie case petitioner had to prove that (i) others similarly situated generally had not been prosecuted for conduct similar to petitioner's and (ii) the Government's discriminatory selection was based on impermissible grounds such as race, religion, or exercise of First Amendment rights. 549 F. Supp. 1376, 1380 (1982). Petitioner satisfied the first requirement, the District Court held, because he had shown that all those prosecuted were "vocal" nonregistrants[6] and because "[t]he inference is strong that the Government could have located non-vocal non-registrants, but chose not to." *Id.*, at 1381. The District Court found the second requirement satisfied for three reasons. First, the passive enforcement program was "'inherently suspect'" because "'it focuse[d] upon the vocal offender . . . [and was] vulnerable to the charge that those chosen for prosecution [were] being punished for their expression of ideas, a constitutionally protected right.'" *Ibid.*, quoting *United States* v. *Steele*, 461

---

[5] The District Court also decided various statutory and regulatory claims. In particular, it held that Presidential Proclamation No. 4771 had been improperly promulgated and dismissed the indictment on this ground as well. 549 F. Supp. 1376, 1391 (1982). The Court of Appeals for the Ninth Circuit reversed this particular holding and affirmed the District Court's rejection of the remaining regulatory claims. 710 F. 2d 1385, 1388–1389 (1983). Only the constitutional claim is now at issue.

We do not decide the issue the dissent sees as central to this case: "whether Wayte has earned the right to discover Government documents relevant to his claim of selective prosecution." *Post*, at 614–615. Even if there were substance to this discovery issue, it was neither raised in the petition for certiorari, briefed on the merits, nor raised at oral argument. Wayte has simply not asserted such a claim before this Court.

[6] This term is misleading insofar as it suggests that all those indicted had made public statements opposing registration. In some cases, the only statement made by the nonregistrant prior to indictment was his letter to the Government declaring his refusal to register.

F. 2d 1148, 1152 (CA9 1972). Second, the Government's awareness that a disproportionate number of vocal nonregistrants would be prosecuted under the passive enforcement system indicated that petitioner was prosecuted because of his exercise of First Amendment rights. 549 F. Supp., at 1382. Finally, the involvement of high Government officials in the prosecution decisions "strongly suggest[ed] impermissible selective prosecution." *Id.*, at 1383. The District Court then held that the Government had failed to rebut the prima facie case.

The Court of Appeals reversed. 710 F. 2d 1385 (CA9 1983). Applying the same test, it found the first requirement satisfied but not the second. The first was satisfied by petitioner's showing that out of the estimated 674,000 nonregistrants the 13 indicted had all been vocal nonregistrants. *Id.*, at 1387. As to the second requirement, the Court of Appeals held that petitioner had to show that the Government focused its investigation on him *because of* his protest activities. *Ibid.* Petitioner's evidence, however, showed only that the Government was aware that the passive enforcement system would result in prosecutions primarily of two types of men—religious and moral objectors and vocal objectors—and that the Government recognized that the latter type would probably make claims of selective prosecution. Finding no evidence of impermissible governmental motivation, the court held that the District Court's finding of a prima facie case of selective prosecution was clearly erroneous. *Id.*, at 1388. The Court of Appeals also found two legitimate explanations for the Government's passive enforcement system: (i) the identities of nonreported nonregistrants were not known, and (ii) nonregistrants who expressed their refusal to register made clear their willful violation of the law.[7]

---

[7] One judge dissented on the ground that the passive enforcement system represented a "deliberate policy . . . designed to punish only those who had communicated their violation of the law to others." 710 F. 2d, at 1389 (Schroeder, J., dissenting). Finding "an enforcement procedure focusing

Recognizing both the importance of the question presented and a division in the Circuits,[8] we granted certiorari on the question of selective prosecution. 467 U. S. 1214 (1984). We now affirm.

### III

In our criminal justice system, the Government retains "broad discretion" as to whom to prosecute. *United States* v. *Goodwin*, 457 U. S. 368, 380, n. 11 (1982); accord, *Marshall* v. *Jerrico, Inc.*, 446 U. S. 238, 248 (1980). "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher* v. *Hayes*, 434 U. S. 357, 364 (1978). This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. Judicial supervision in this area, moreover, entails systemic costs of particular concern. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy. All these are substantial concerns that

---

solely upon vocal offenders . . . inherently suspect," *id.*, at 1390, she would have shifted the burden of persuasion on discriminatory intent to the Government.

[8] Compare *United States* v. *Eklund*, 733 F. 2d 1287 (CA8 1984) (en banc) (upholding criminal conviction under passive enforcement scheme), cert. pending, No. 83–1959, with *United States* v. *Schmucker*, 721 F. 2d 1046 (CA6 1983) (ordering hearing on selective prosecution claim), cert. pending, No. 83–2035.

make the courts properly hesitant to examine the decision whether to prosecute.

As we have noted in a slightly different context, however, although prosecutorial discretion is broad, it is not "'unfettered.' Selectivity in the enforcement of criminal laws is . . . subject to constitutional constraints." *United States* v. *Batchelder*, 442 U. S. 114, 125 (1979) (footnote omitted). In particular, the decision to prosecute may not be "'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification,'" *Bordenkircher* v. *Hayes, supra,* at 364, quoting *Oyler* v. *Boles*, 368 U. S. 448, 456 (1962), including the exercise of protected statutory and constitutional rights, see *United States* v. *Goodwin, supra,* at 372.

It is appropriate to judge selective prosecution claims according to ordinary equal protection standards.[9] See *Oyler* v. *Boles, supra.* Under our prior cases, these standards require petitioner to show both that the passive enforcement system had a discriminatory effect and that it was motivated by a discriminatory purpose.[10] *Personnel Administrator of*

---

[9] Although the Fifth Amendment, unlike the Fourteenth, does not contain an equal protection clause, it does contain an equal protection component. *Bolling* v. *Sharpe*, 347 U. S. 497, 499 (1954). "[Our] approach to Fifth Amendment equal protection claims has . . . been precisely the same as to equal protection claims under the Fourteenth Amendment." *Weinberger* v. *Wiesenfeld*, 420 U. S. 636, 638, n. 2 (1975).

[10] A showing of discriminatory intent is not necessary when the equal protection claim is based on an overtly discriminatory classification. See *Strauder* v. *West Virginia*, 100 U. S. 303 (1880). No such claim is presented here, for petitioner cannot argue that the passive policy discriminated on its face.

The dissent argues that Wayte made a nonfrivolous showing of all three elements of a prima facie case as established in the context of grand jury selection. *Castaneda* v. *Partida*, 430 U. S. 482, 494–495 (1977). Neither the parties nor the courts below, however, discussed the prima facie case in these terms. Rather, they used the phrase to refer to whether Wayte had made a showing, which, if unrebutted, would directly establish discriminatory effect and purpose. Even applying standards from the grand

*Massachusetts* v. *Feeney*, 442 U. S. 256 (1979); *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252 (1977); *Washington* v. *Davis*, 426 U. S. 229 (1976). All petitioner has shown here is that those eventually prosecuted, along with many not prosecuted, reported themselves as having violated the law. He has not shown that the enforcement policy selected nonregistrants for prosecution on the basis of their speech. Indeed, he could not have done so given the way the "beg" policy was carried out. The Government did not prosecute those who reported themselves but later registered. Nor did it prosecute those who protested registration but did not report themselves or were not reported by others. In fact, the Government did not even investigate those who wrote letters to Selective Service criticizing registration unless their letters stated affirmatively that they had refused to comply with the law. Affidavit of Edward A. Frankle, Special Assistant to the Director of Selective Service for Compliance, App. 635. The Govern-

---

jury selection context, however, we believe that Wayte has failed to establish a prima facie case. For example, although the dissent describes the first element as merely whether the individual "is a member of a recognizable, distinct class," *post*, at 626, it is clear for reasons we discuss, *infra*, at this page and 610, that Wayte has not established the first element as actually defined by *Castaneda:* whether the individual is a member of an "identifiable group" that is "a recognizable, distinct class, *singled out for different treatment under the laws, as written or as applied.*" 430 U. S., at 494 (emphasis added). For these same reasons, we believe Wayte has failed to establish the other *Castaneda* elements, particularly the third. Furthermore, even assuming that Wayte did make out this kind of prima facie case, the "beg" policy would rebut it.

The dissent also argues that *Yick Wo* v. *Hopkins*, 118 U. S. 356 (1886), would have been decided differently under the approach we take today. *Post*, at 630–631. This misunderstanding stems from its belief that "the Government intentionally discriminated in defining the pool of potential prosecutees" in this case. *Post*, at 630. This premise, however, mistakes the facts. The prosecution pool consisted of all reported nonregistrants, not just "vocal" nonregistrants, and there is no evidence of Government intent to prosecute individuals because of their exercise of First Amendment rights.

ment, on the other hand, did prosecute people who reported themselves or were reported by others but who did not publicly protest. These facts demonstrate that the Government treated all reported nonregistrants similarly. It did not subject vocal nonregistrants to any special burden. Indeed, those prosecuted in effect selected themselves for prosecution by refusing to register after being reported and warned by the Government.

Even if the passive policy had a discriminatory effect, petitioner has not shown that the Government intended such a result. The evidence he presented demonstrated only that the Government was aware that the passive enforcement policy would result in prosecution of vocal objectors and that they would probably make selective prosecution claims. As we have noted, however: "'Discriminatory purpose' . . . implies more than . . . intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Massachusetts* v. *Feeney, supra,* at 279 (footnotes and citations omitted). In the present case, petitioner has not shown that the Government prosecuted him *because of* his protest activities. Absent such a showing, his claim of selective prosecution fails.

## IV

Petitioner also challenges the passive enforcement policy directly on First Amendment grounds.[11] In particular, he claims that "[e]ven though the [Government's passive] enforcement policy did not overtly punish protected speech as

---

[11] Petitioner alleges that the passive enforcement policy violated both his right to free speech and his right to petition. Because he does not argue that it burdened each right differently, we view these claims as essentially the same. Although the right to petition and the right to free speech are separate guarantees, they are related and generally subject to the same constitutional analysis. See *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 911–915 (1982).

such, it inevitably created a content-based regulatory system with a concomitantly disparate, content-based impact on nonregistrants."[12]   Brief for Petitioner 23.   This Court has held that when, as here, "'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States* v. *O'Brien*, 391 U. S. 367, 376 (1968).   Government regulation is justified

> "if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.*, at 377.

Accord, *Seattle Times Co.* v. *Rhinehart*, 467 U. S. 20, 32 (1984); *Procunier* v. *Martinez*, 416 U. S. 396, 413 (1974).   In the present case, neither the first nor third condition is disputed.

There can be no doubt that the passive enforcement policy meets the second condition.   Few interests can be more compelling than a nation's need to ensure its own security.

---

[12] As an initial matter, we note doubt that petitioner has demonstrated injury to his First Amendment rights.   The Government's "beg" policy removed most, if not all, of any burden passive enforcement placed on free expression.   Because of this policy, nonregistrants could protest registration and still avoid any danger of prosecution.   By simply registering after they had reported themselves to the Selective Service, nonregistrants satisfied their obligation and could thereafter continue to protest registration.   No matter how strong their protest, registration immunized them from prosecution.   Strictly speaking, then, the passive enforcement system penalized continued violation of the Military Selective Service Act, not speech.   The only right it burdened was the asserted "right" not to register, a "right" without foundation either in the Constitution or the history of our country.   See *Selective Draft Law Cases*, 245 U. S. 366 (1918).

It is well to remember that freedom as we know it has been suppressed in many countries. Unless a society has the capability and will to defend itself from the aggressions of others, constitutional protections of any sort have little meaning. Recognizing this fact, the Framers listed "provid[ing] for the common defence," U. S. Const., Preamble, as a motivating purpose for the Constitution and granted Congress the power to "provide for the common Defence and general Welfare of the United States," Art. I, § 8, cl. 1. See also The Federalist Nos. 4, 24, and 25. This Court, moreover, has long held that the power "to raise and support armies . . . is broad and sweeping," *United States* v. *O'Brien, supra,* at 377; accord, *Lichter* v. *United States,* 334 U. S. 742, 755–758 (1948); *Selective Draft Law Cases,* 245 U. S. 366 (1918), and that the "power . . . to classify and conscript manpower for military service is 'beyond question,'" *United States* v. *O'Brien, supra,* at 377, quoting *Lichter* v. *United States, supra,* at 756; accord, *Selective Draft Law Cases, supra.* With these principles in mind, the three reasons the Government offers in defense of this particular enforcement policy are sufficiently compelling to satisfy the second *O'Brien* requirement—as to either those who reported themselves or those who were reported by others.

First, by relying on reports of nonregistration, the Government was able to identify and prosecute violators without further delay. Although it still was necessary to investigate those reported to make sure that they were required to register and had not, the Government did not have to search actively for the names of these likely violators. Such a search would have been difficult and costly at that time. Indeed, it would be a costly step in any "active" prosecution system involving thousands of nonregistrants. The passive enforcement program thus promoted prosecutorial efficiency. Second, the letters written to Selective Service provided strong, perhaps conclusive evidence of the nonregistrant's

intent not to comply—one of the elements of the offense.[13] Third, prosecuting visible nonregistrants was thought to be an effective way to promote general deterrence, especially since failing to proceed against publicly known offenders would encourage others to violate the law.

The passive enforcement policy also meets the final requirement of the *O'Brien* test, for it placed no more limitation on speech than was necessary to ensure registration for the national defense. Passive enforcement not only did not subject "vocal" nonregistrants to any special burden, *supra*, at 609–610, but also was intended to be only an interim enforcement system. Although Selective Service was engaged in developing an active enforcement program when it investigated petitioner, it had by then found no practicable way of obtaining the names and current addresses of likely nonregistrants.[14] Eventually, it obtained them by matching state driver's license records with Social Security files. It took some time, however, to obtain the necessary authorizations and to set up this system. Passive enforcement was the only effective interim solution available to carry out the Government's compelling interest.

We think it important to note as a final matter how far the implications of petitioner's First Amendment argument would extend. Strictly speaking, his argument does not con-

---

[13] Section 12(a) of the Military Selective Service Act, 62 Stat. 622, as amended, 50 U. S. C. App. § 462(a), provides that a criminal nonregistrant must "evad[e] or refus[e]" to register. For conviction, the courts have uniformly required the Government to prove that the failure to register was knowing. *E. g., United States* v. *Boucher*, 509 F. 2d 991 (CA8 1975); *United States* v. *Rabb*, 394 F. 2d 230 (CA3 1968). Neither party contests this requirement here.

[14] Selective Service had tried to use Social Security records but found that the addresses there were hopelessly stale. And under the law, 26 U. S. C. § 6103, it could gain no useful access to Internal Revenue Service records—the only other recognized federal source of generally accurate information.

cern passive enforcement but self-reporting. The concerns he identifies would apply to all nonregistrants who report themselves even if the Selective Service engaged only in active enforcement. For example, a nonregistrant who wrote a letter informing Selective Service of his failure to register could, when prosecuted under an active system, claim that the Selective Service was prosecuting him only because of his "protest." Just as in this case, he could have some justification for believing that his letter had focused inquiry upon him. Prosecution in either context would equally "burden" his exercise of First Amendment rights. Under the petitioner's view, then, the Government could not constitutionally prosecute a self-reporter—even in an active enforcement system—unless perhaps it could prove that it would have prosecuted him without his letter. On principle, such a view would allow any criminal to obtain immunity from prosecution simply by reporting himself and claiming that he did so in order to "protest" the law. The First Amendment confers no such immunity from prosecution.

## V

We conclude that the Government's passive enforcement system together with its "beg" policy violated neither the First nor Fifth Amendment. Accordingly, we affirm the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

The Court decides today that petitioner "has not shown that the Government prosecuted him *because of* his protest activities," and it remands to permit his prosecution to go forward. However interesting the question decided by the Court may be, it is not necessary to the disposition of this case. Instead, the issue this Court must grapple with is far less momentous but no less deserving of thoughtful treatment. What it must decide is whether Wayte has earned the

right to discover Government documents relevant to his claim of selective prosecution.

The District Court ordered such discovery, the Government refused to comply, and the District Court dismissed the indictment. The Court of Appeals reversed on the grounds that Wayte had failed to prevail on the merits of his selective prosecution claim, and that the discovery order was improper. If Wayte is entitled to obtain evidence currently in the Government's possession, the Court cannot dismiss his claim on the basis of only the evidence now in the record. To prevail here, then, all that Wayte needs to show is that the District Court applied the correct legal standard and did not abuse its discretion in determining that he had made a nonfrivolous showing of selective prosecution entitling him to discovery.

There can be no doubt that Wayte has sustained his burden. Therefore, his claim cannot properly be dismissed at this stage in the litigation. I respectfully dissent from this Court's decision to do so.

I

In order to understand the precise nature of the legal question before this Court, it is important to review in some detail the posture in which this case comes to us. In July 1982, an indictment filed in the District Court for the Central District of California charged Wayte with knowingly and willfully failing to register for the draft. In September 1982, Wayte moved to have the indictment dismissed on the ground of selective prosecution.

In support of his claim, he presented 10 exhibits: 7 internal Justice Department memoranda discussing the mechanism for the prosecution of individuals who failed to register for the draft, a report by the United States General Accounting Office discussing alternatives to the registration program, a statement by the Director of Selective Service before the Subcommittee on Courts, Civil Liberties and the Administration of Justice of the House Judiciary Committee, and a

transcript of a meeting of the Department of Defense's Military Manpower Task Force. According to Wayte, this evidence supported his claim that the Government had designed a prosecutorial scheme that purposefully discriminated against those who had chosen to exercise their First Amendment right to oppose draft registration. Wayte argued that he had demonstrated sufficient facts on his claim of selective prosecution to be entitled to an evidentiary hearing on that issue. In this regard, Wayte moved to discover a variety of Government documents that he asserted were relevant to his selective prosecution claim, and indicated his intention to subpoena seven out-of-district witnesses, including Edwin Meese III, the Counsellor to the President.

On September 30, 1982, the District Court found that the motion to dismiss the indictment on the ground of selective prosecution was "non-frivolous." The following day, it held a hearing in which the parties presented their disagreements over Wayte's discovery requests. The District Court granted some of Wayte's requests, denied others, and ordered the Government to submit some documents for *in camera* inspection. At a hearing on October 5, the District Court denied the Government's motion for reconsideration of the discovery order and postponed ruling on the requested subpoenas until after a preliminary evidentiary hearing on Wayte's selective prosecution claim.

This hearing was held on October 7. Two witnesses testified: David J. Kline, a Senior Legal Advisor at the Justice Department's Criminal Division, and Richard Romero, an Assistant United States Attorney in the Central District of California and the principal prosecutor in Wayte's case. Kline's testimony dealt extensively with the Justice Department's policies for prosecuting individuals who violated the draft-registration statute.

At a nonevidentiary hearing on October 15, the District Court ruled that portions of three of the many documents that had been submitted *in camera* should be turned over to

the defense. The three documents in question had previously been given to the defense in expurgated fashion. As to certain parts of them, however, the District Court determined that the defense's need for the still undisclosed materials outweighed the Government's interest in nondisclosure. Specifically, the District Court ordered disclosure of two sentences and one paragraph in one letter, and one paragraph in each of two memoranda. The District Court also indicated that some of the documents submitted for *in camera* review had been redacted in a manner that made them incomprehensible.

The Government was less than eager to comply with the District Court's order of October 15. The Government's response to that order indicated, in a paragraph that was later stricken at the Government's request following an admonishment by the District Court:

"It is obvious that the Court's appetite for more and more irrelevant disclosures of sensitive information has become insatiable. It is also apparent that with each new disclosure, made pursuant to near-impossible deadlines, the court feels compelled to impugn the motives of the Government." Record, Doc. No. 95, p. 3.

The Government invoked a "deliberative processes" privilege for documents that it had turned over to the District Court for *in camera* review. It also refused to allow Meese's testimony, on the ground that all information on which he could testify was privileged.

The saga continued on October 20, when the District Court ordered the production, for *in camera* review, of unredacted versions of documents that had previously been submitted in redacted form. The Government eventually complied with that order.

On October 29, the District Court ordered that certain portions of those documents be turned over to the defense. The list of documents was kept under seal. The District Court

applied the standard for determining whether an assertion of executive privilege is valid announced in *United States* v. *Nixon*, 418 U. S. 683, 711 (1974). The court determined:

"Applying the balancing test from *Nixon* to the facts, this court finds that the scales of justice tip decidedly in favor of the defendant's right to review several of the documents which this court has inspected *in camera*. The Government's generalized assertion of a 'deliberative process' executive privilege must yield to the defendant's specific need for for documents, which this court has determined must be released to Mr. Wayte." Record, Doc. No. 119, p. 5.

In the same order, the District Court also granted Wayte's request that Meese be ordered to testify at an evidentiary hearing. In this connection, the District Court made a series of findings: (1) that the Government's normal prosecutorial policies were not being followed for the prosecution of nonregistrants; (2) that Meese served as a nexus between the White House and the Justice Department on this issue; and (3) that Meese had been directly involved in decisions involving the Government's prosecutorial policies toward nonregistrants. It therefore determined that his testimony was relevant to Wayte's claim.

The Government refused to comply with the District Court's order of October 29. It explained:

"[I]t is our position that important governmental interests are at stake in connection with our claim of privilege, which we sincerely believe have not been shown to be overridden in this case. Nor can we concur in the Court's conclusion that a sufficient basis has been established to justify requiring the appearance and testimony of an official as senior as the Counsellor to the President. Contrary to the Court's finding in its Order of October 29, 1982, we believe that the record amply demonstrates that decisions relating to the prosecution of nonregistrants were made within the Department of Justice and

that there is, therefore, no nexus between the White House and the selection of the defendant for prosecution." Record, Doc. No. 123, p. 3.

The District Court held its last hearing on this matter on November 15. In an order and opinion filed that day, the District Court dismissed Wayte's indictment. 549 F. Supp. 1376 (1982). It found, first, that Wayte had alleged sufficient facts on his selective prosecution claim "to take the question beyond the frivolous stage," *id.*, at 1379 (citing *United States* v. *Erne*, 576 F. 2d 212, 216 (CA9 1978)), and thus had earned the right to discover relevant Government documents. Second, it found that the Government had refused to comply with the discovery order of October 29 and that it was the Government's position that "the only way to achieve appellate review of the Government's assertion of executive privilege is for the court to dismiss the indictment against the defendant." 549 F. Supp., at 1378–1379; see *Alderman* v. *United States*, 394 U. S. 165, 181 (1969) ("[D]isclosure must be made even though attended by potential danger to the reputation or safety of third parties or to the national security—unless the United States would prefer dismissal of the case to disclosure of the information").

Having made these findings, the District Court turned to the merits of Wayte's underlying claim. It found that Wayte had gone beyond satisfying the standard for obtaining discovery, and that he had in fact made out a prima facie case of selective prosecution. 549 F. Supp., at 1379–1380. As a result, the burden shifted to the Government to prove that its policy was not based on impermissible motives. The District Court found that the Government had failed to rebut Wayte's prima facie case. *Id.*, at 1382–1385.

On appeal to the Court of Appeals for the Ninth Circuit, the Government conceded that "[t]he event that triggered dismissal for selective prosecution was the government's declination, following the surrender of Presidential documents to the court, to comply with orders directing that certain of

these documents be furnished to the defense and that Presidential Counsellor Edwin Meese be made available as a witness." Brief for United States in No. 82–1699 (CA9), p. 42. The Government gave two reasons for its refusal to comply with the District Court's order. First, it maintained that Wayte "did not even meet the colorable basis test so as to trigger a discovery obligation on the part of the government." *Id.*, at 44. Second, it argued that Wayte had not shown that he had a particularized need for the privileged materials that was sufficiently substantial to outweigh the asserted need to preserve confidentiality. *Id.*, at 45. The Government acknowledged that the District Court had applied the correct standard for evaluating claims of privilege— that set out in *United States* v. *Nixon, supra.* The Government, however, disagreed with the manner in which the District Court had weighed the relevant factors.

In his brief to the Ninth Circuit, Wayte argued that one independent basis for the dismissal of the indictment was that the Government had refused to comply with the District Court's lawful discovery orders. Brief for Appellee in No. 82–1699 (CA9), pp. 20–31. Wayte's brief clearly stated that "the indictment could properly have been dismissed on that basis alone." *Id.*, at 20. In this connection, Wayte argued that he had alleged sufficient facts to take his selective prosecution claim beyond the frivolous stage, that the District Court's orders concerned materials that were relevant to that claim, that the propriety of discovery orders must be reviewed under an abuse of discretion standard, that the District Court had not abused its discretion in ordering discovery in this case, and that the District Court properly rejected the Government's claim of privilege.

A divided panel of the Court of Appeals for the Ninth Circuit reversed the dismissal of Wayte's indictment. 710 F. 2d 1385 (1983). Writing for the majority, Judge Wright focused primarily on the merits of the underlying selective prosecution claim. He concluded that, on the record before the

court, Wayte had failed to show that he was selected for prosecution "because of his exercise of his constitutional rights." *Id.*, at 1387.

The Court of Appeals dealt with the Government's failure to comply with the discovery order in only one brief paragraph:

> "Because Wayte made no initial showing of selective prosecution, he was not entitled to discovery of government documents. That access to the documents might have been helpful to him does not in itself entitle him to discovery. The government's refusal to comply with the discovery orders was justified." *Id.*, at 1388 (citations omitted).

In an unsuccessful petition for rehearing, Wayte argued that the majority had overlooked the standard of review applicable to trial court discovery orders. Pet. for Rehearing and Suggestion of Appropriateness of Rehearing en Banc in No. 82–1699 (CA9), pp. 8–10. Wayte renewed his selective prosecution arguments before this Court. See Pet. for Cert. 9–12; Tr. of Oral Arg. 9–11.

## II

## A

This streamlined account of the stormy proceedings below makes clear that, from a legal perspective, this case is first and foremost a discovery dispute. If the District Court correctly resolved the discovery issue, Wayte was entitled to additional evidence. And if he was entitled to additional evidence, the Court cannot reject his claim on the merits, on the basis of only the evidence to which Wayte had access at the time of the District Court proceedings.[1]

---

[1] The Court expressly refuses to consider the question whether Wayte has earned the right to discover relevant Government documents; it maintains that this claim was not properly asserted here. See *ante*, at 605, n. 5. That conclusion is quite surprising. The grant of certiorari in this

The question of whether the discovery order was appropriate breaks down into three narrower inquiries. The first is whether Wayte made a sufficient showing of selective pros-

case was limited to "Question 1 presented by the petition," 467 U. S. 1214 (1984), which focused on a conflict among the Federal Circuits. Wayte offered only one reason for granting certiorari on that question:

"The *direct conflict* between the Sixth and Ninth Circuits on an issue concerning the exercise of First Amendment rights particularly in view of the pending prosecutions in other circuits raising the identical question, justifies the grant of certiorari to review the judgment below." Pet. for Cert. 12 (emphasis added).

In the case to which Wayte referred, the Sixth Circuit had held that the defendant was "entitled to a hearing on his charge of selective prosecution." *United States* v. *Schmucker*, 721 F. 2d 1046, 1048 (1983). Given that the lower courts have applied the same standard for granting discovery orders and evidentiary hearings in this area, the Sixth Circuit's holding also would entitle the defendant in that case to discovery, and the Sixth Circuit's holding therefore is in "direct conflict" with the Ninth Circuit's holding that Wayte was not entitled to discovery. Compare, *e. g.*, *United States* v. *Berrios*, 501 F. 2d 1207, 1211 (CA2 1974), with *United States* v. *Erne*, 576 F. 2d 212, 216 (CA9 1978). The discovery question could not have been raised more clearly in the lower courts and, contrary to the Court's suggestion, it is squarely presented.

In addition, to the extent that the Court chooses to address the merits of Wayte's selective prosecution claim, *ante*, at 607–610, it must also decide the antecedent discovery question. First, the merits of that constitutional claim, which were not briefed before this Court, are certainly no better presented than Wayte's discovery claim. Second, it makes little sense to decide whether, at the time that the Government chose to ignore the District Court's discovery order, Wayte had amassed sufficient evidence to prove that the Government acted in a discriminatory manner. The threshold question is, of course, whether Wayte presented enough evidence of a constitutional violation to be entitled to documents in the Government's possession. If he was entitled to such discovery, the merits should not be addressed until the record is complete.

Finally, it is curious that the Court here professes such concern about whether the discovery issue was properly presented. Indeed, the Court chooses to address Wayte's claim that the prosecution scheme placed a direct burden on the exercise of First Amendment rights. *Ante*, at 610–614. That claim was not presented or ruled upon by the District Court, was not presented or ruled upon on appeal, and was not raised in Wayte's petition for certiorari. To the extent that the Court discusses that claim on the

ecution to be entitled to any discovery. The second is whether the documents and testimony ordered released were relevant to Wayte's selective prosecution claim, that is, whether the scope of discovery was appropriate. The third is whether Wayte's need for the materials outweighed the Government's assertion of executive privilege. The Court of Appeals dealt with only the first of these questions, finding that an adequate showing had not been made. Thus, if that decision is incorrect, the proper disposition of this case is a remand to the Court of Appeals for a determination of the second and third questions. Certainly this Court is in no position to perform those inquiries, as the documents at stake, which were submitted to the District Court for *in camera* review, are not before us.

## B

A two-part inquiry leads to the resolution of the narrow discovery question before this Court: (1) what showing must a defendant make to obtain discovery on a claim of selective prosecution, and (2) under what standard does an appellate court review a district court's finding that the required showing was made.

The Courts of Appeals have adopted a standard under which a defendant establishes his right to discovery if he can show that he has a "colorable basis" for a selective prosecution claim. See, *e. g., United States* v. *Murdock*, 548 F. 2d 599, 600 (CA5 1977); *United States* v. *Cammisano*, 546 F. 2d 238, 241 (CA8 1976); *United States* v. *Berrios*, 501 F. 2d 1207, 1211 (CA2 1974); *United States* v. *Berrigan*, 482 F. 2d 171, 181 (CA3 1973). To make this showing, a defendant must allege sufficient facts in support of his selective prosecution claim "to take the question past the frivolous state." *United States* v. *Hazel*, 696 F. 2d 473,

ground that all of Wayte's constitutional claims are interrelated, it must also discuss the threshold constitutional claim: Whether Wayte made a sufficient showing of a constitutional violation to be entitled to discovery.

475 (CA6 1983); *United States* v. *Erne,* 576 F. 2d, at 216. In general, a defendant must present "some evidence tending to show the existence of the essential elements of the defense." *United States* v. *Berrios, supra,* at 1211.

This standard, which the District Court applied in this case, is consistent with our exhortation that "[t]he need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts." *United States* v. *Nixon,* 418 U. S., at 709. It also recognizes that most of the relevant proof in selective prosecution cases will normally be in the Government's hands. Cf. *Poller* v. *Columbia Broadcasting System, Inc.,* 368 U. S. 464, 473 (1962). At the same time, the standard adequately protects the Government from attempts by the defense to seek discovery as a means of harassment or of delay. See *United States* v. *Murdock, supra,* at 600.

With respect to the second determination, which concerns the appropriate scope of review, there is no doubt that trial judges should enjoy great deference in discovery matters. District court decisions on discovery are therefore not subject to plenary review on appeal, but are instead reviewed under an abuse-of-discretion standard. As we stated in *United States* v. *Nixon:*

> "Enforcement of a pretrial subpoena *duces tecum* must necessarily be committed to the sound discretion of the trial court since the necessity for the subpoena most often turns upon a determination of factual issues. Without a determination of arbitrariness or that the trial court finding was without record support, an appellate court will not ordinarily disturb a finding that the applicant for a subpoena complied with [Federal Rule of Criminal Procedure] 17(c)." 418 U. S., at 702.

The abuse-of-discretion standard acknowledges that appellate courts in general, and this Court in particular, should not

expend their limited resources making determinations that can profitably be made only at the trial level. Cf. *Anderson* v. *Bessemer City, ante,* at 573–576; *Florida* v. *Rodriguez,* 469 U. S. 1, 12 (1984) (STEVENS, J., dissenting).

The Court of Appeals below, however, did not even mention the appropriate standard of review, much less explain how to apply it. To the extent that its conclusory statements shed any light on the basis for its decision, it appears that the Court of Appeals performed a *de novo* inquiry. Such review is especially inappropriate in this case, given the painstaking care that the District Court took in supervising the discovery process, and the narrowly tailored scope of its rulings.

## III

The proper starting point, then, is to consider whether the District Court abused its discretion in determining that Wayte had presented sufficient facts to support a nonfrivolous claim of selective prosecution. I believe that the District Court acted well within the scope of its discretion.

To evaluate the merit of Wayte's claim, I consider the elements of a prima facie case of selective prosecution and ascertain whether Wayte has made a nonfrivolous showing as to the existence of these elements. It is important to bear in mind at this stage that Wayte need not have made out a full prima facie case in order to be entitled to discovery. A prima facie case, of course, is one that if unrebutted will lead to a finding of selective prosecution. It shifts to the Government the burden of rebutting the presumption of unconstitutional action. See *Rose* v. *Mitchell,* 443 U. S. 545, 565 (1979); *Duren* v. *Missouri,* 439 U. S. 357, 368 (1979); *Castaneda* v. *Partida,* 430 U. S. 482, 495 (1977); *Alexander* v. *Louisiana,* 405 U. S. 625, 631–632 (1972). But a defendant need not meet this high burden just to get discovery; the standard for discovery is merely nonfrivolousness.

Moreover, Wayte need not convince this Court, as he had no need to persuade the Court of Appeals, that it would have

made a finding of nonfrivolousness itself if it had sat as a finder of fact. All that he needs to show is that the District Court's finding of nonfrivolousness did not constitute an abuse of discretion. See *United States* v. *Cammisano*, 546 F. 2d, at 242; *United States* v. *Berrios*, 501 F. 2d, at 1211–1212. I turn, then, to consider whether a sufficient showing was made.

The Court correctly points out that Wayte's selective prosecution claims must be judged according to ordinary equal protection standards. *Ante*, at 608; see *Oyler* v. *Boles*, 368 U. S. 448, 456 (1962); *Yick Wo* v. *Hopkins*, 118 U. S. 356, 373 (1886). Wayte presents an equal protection challenge to the "passive" enforcement system, under which Selective Service refers to the Justice Department for further investigation and possible prosecution *only* the "names of young men who fall into two categories: (1) those who wrote to Selective Service and said that they refused to register and (2) those whose neighbors and others reported them as persons who refused to register." App. 239. Wayte argues that the scheme purposefully singled out these individuals as a result of their exercise of First Amendment rights. See Brief for Appellee in No. 82–1699 (CA9), pp. 3–8, 11–20.

To make out a prima facie case, Wayte must show first that he is a member of a recognizable, distinct class. Second, he must show that a disproportionate number of this class was selected for investigation and possible prosecution. Third, he must show that this selection procedure was subject to abuse or was otherwise not neutral. *Castaneda* v. *Partida*, *supra*, at 494. The inquiry then is whether Wayte has presented sufficient evidence as to each of the elements to show that the claim is not frivolous.

Wayte has clearly established the first element of a prima facie case. The record demonstrates unequivocally that Wayte is a member of a class of vocal opponents to the Government's draft registration program. All members of that class exercised a First Amendment right to speak freely and

to petition the Government for a redress of grievances, and either reported themselves or were reported by others as having failed to register for the draft.

To establish the second element, Wayte must show that the "passive" enforcement policy identified for investigation and possible prosecution a disproportionate number of vocal opponents of draft registration. The record, as it stands given the Government's refusal to comply with the District Court's discovery order, does not contain a breakdown of how many of the approximately 300 young men referred by Selective Service to the Justice Department were "vocal." However, the record suggests that responsible officials in the Justice Department were aware that the vast majority of these individuals would be vocal opponents of draft registration.

For example, a draft letter prepared by David J. Kline, the Justice Department official responsible for overall enforcement of the draft registration law, for Assistant Attorney General Jensen to send to Herbert C. Puscheck, Selective Service's Associate Director for plans and operations, stated:

> "Unfortunately, we believe that if the government initiates prosecutions with only the present passive identification scheme in place, there exists a real risk that the United States will lose at least a few of those initial cases. There is a high probability that persons who write to the Service and that persons who are reported by others are vocal proponents of non-registration. Since a passive identification scheme necessarily means that there will be enormous numbers of non-registrants who are neither identified nor prosecuted, a prosecution of a vocal non-registrant will undoubtedly lead to claims that the prosecution is brought in retribution for the non-registrant's exercise of his first amendment rights. *Indeed, with the present univers[e] of hundreds of thousands of non-registrants, the chances that a quiet non-registrant will be prosecuted is probably about the*

*same as the chances that he will be struck by lightning.*"
App. 290–291 (emphasis added; citation omitted).

Similarly a memorandum from Jensen to various United
States Attorney's Offices states:

"Selective Service's enforcement program is presently
'passive.' Non-registrants are brought to the Service's
attention either when they report themselves or when
others report them. Consequently, the first prosecu-
tions are liable to consist of a large sample of (1) persons
who object on religious and moral grounds and (2) per-
sons who publicly refuse to register." *Id.*, at 361–362.

Perhaps, by itself, this evidence would not suffice to estab-
lish the second element of a prima facie case. However, it is
more than adequate to make nonfrivolous the claim that the
"passive" enforcement scheme identified for possible pros-
ecution a disproportionate number of vocal opponents of draft
registration.

As to the third element, the decision to implement the
"passive" enforcement system was certainly a decision sus-
ceptible to abuse. "This is indeed an exceptional area of
national life where conscientious opposition to government
policy has been intertwined with violations of the laws which
implement the policy." *United States* v. *Falk*, 479 F. 2d
616, 625 (CA7 1973) (en banc) (Fairchild, J., concurring).
The correlation between vocal opposition and violations of the
law makes it relatively easy to punish speech under the guise
of enforcing the laws.

Here, the enforcement scheme was implemented with full
knowledge that its effects would be particularly harsh on vocal
opponents of the Government's policies. See App. 290–291,
361–362 (quoted *supra*, at 627 and this page); cf. 549 F. Supp.,
at 1384 (Government "recognized the passive program had
potentially serious first amendment problems"). Such knowl-
edge makes the scheme directly vulnerable to the charge that
its purpose was to punish individuals for the exercise of their

First Amendment rights. This Court has recognized that "[a]dherence to a particular policy or practice, 'with full knowledge of the predictable effects of such adherence . . . is one factor among others which may be considered by a court'" in determining whether a decision was based on an impermissible ground. *Columbus Board of Education* v. *Penick*, 443 U. S. 449, 465 (1979); see also *Personnel Administrator of Massachusetts* v. *Feeney*, 442 U. S. 256, 279, n. 25 (1979); *id.*, at 283 (MARSHALL, J., dissenting) ("To discern the purposes underlying facially neutral policies, this Court has . . . considered the . . . foreseeability of any disproportionate impact"); *United States* v. *Steele*, 461 F. 2d 1148, 1152 (CA9 1972).

Thus, Wayte has established the first and third elements of a prima facie case, and has presented a colorable claim as to the second.[2] As a result, there can thus be no doubt that the District Court did not abuse its discretion when it found that Wayte's equal protection claim was not frivolous.

The Court, of course, has not viewed this case through the same lens. Instead of focusing on the elements of a prima facie case, and on whether Wayte presented sufficient evidence as to the existence of each of these elements to earn the right to discover relevant information in the Government's possession, the Court leaps over these two issues and proceeds directly to the merits of the equal protection claim. The Court's analysis is flawed in two respects. First, as I have shown, the Court ignores the simple fact that, if Wayte is entitled to discovery, his claim cannot be rejected on the merits for lack of evidence.

Second, and of equal importance, the Court errs in the manner in which it analyzes the merits of the equal protection claim. It simply focuses on the wrong problem when it states that "the Government treated all reported nonregistrants similarly" and that "those prosecuted in effect selected

---

[2] None of the evidence presented by the Government to the District Court places in any serious question the existence of these three elements.

themselves for prosecution by refusing to register after being reported and warned by the Government." *Ante,* at 610. Those issues are irrelevant to the correct disposition of this case.

The claim here is not that the Justice Department discriminated among *known* violators of the draft registration law either in its administration of the "beg" policy, which gave such individuals the option of registering to avoid prosecution, or in prosecuting only some reported nonregistrants. Instead, the claim is that the system by which the Department defined the class of possible prosecutees—the "passive" enforcement system—was designed to discriminate against those who had exercised their First Amendment rights. Such governmental action cannot stand if undertaken with discriminatory intent. As this Court has clearly stated, "for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is 'patently unconstitutional.'" *Bordenkircher* v. *Hayes,* 434 U. S. 357, 363 (1978); see also *United States* v. *Goodwin,* 457 U. S. 368, 372 (1982). If the Government intentionally discriminated in defining the pool of potential prosecutees, it cannot immunize itself from liability merely by showing that it used permissible methods in choosing whom to prosecute from this previously tainted pool. Cf. *Connecticut* v. *Teal,* 457 U. S. 440, 450–451 (1982).

Under the Court's flawed approach, there would have been no equal protection violation in *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886), this Court's seminal selective prosecution decision. In *Yick Wo,* the Court reversed a conviction under a municipal ordinance that prohibited the construction of wooden laundries without a license. The Court held that such a conviction could not stand because the municipal licensors had discriminatorily denied licenses to individuals of Chinese origin. If the Court then had focused only on the prosecutions themselves, as it does now, it would have found no discrimination in the choice, among violators of the ordi-

nance, of the individuals to be prosecuted.  Indeed, all but one of these violators were of Chinese origin.  Instead, the Court properly focused on the official action that led to those prosecutions.  In *Yick Wo*, that prior action was the discriminatory denial of licenses, which affected the definition of the class from which prosecutees were chosen.  In this case, the referrals made by Selective Service to the Justice Department for investigation and possible prosecution played a similar role and may also have been discriminatory.  It is to that issue that the Court should have directed its attention.

I do not suggest that all prosecutions undertaken pursuant to passive enforcement schemes warrant evidentiary hearings on the question of selective prosecution.  But where violations of the law are so closely intertwined with political activity, where the speech at issue is so unpalatable to the Government, and where the discriminatory effect is conceded, the need for a hearing is significant and in no way opens the door to an onslaught of such hearings in less compelling contexts.[3]

Here, I believe that Wayte has raised sufficient questions about the Government's intentions to be entitled to obtain access to evidence in the Government's possession.  I therefore dissent from the Court's outright dismissal of his equal protection claim.

---

[3] In my mind, Wayte's claim that the "passive" enforcement scheme placed a direct burden on First Amendment freedoms, *ante*, at 607–610, should not be addressed at this stage in the litigation.  The materials that Wayte sought to discover, and that he well may be entitled to discover, could be relevant to that claim.  The Court of Appeals should resolve the issue of access to evidence on remand; the resolution of the merits of Wayte's claims should await a final determination of that issue.