**UNITED STATES of America, Plaintiff,**

v.

**Octavio CORREA–GOMEZ, et al., Defendant.**

**No. Cr.A. 01–32.**

United States District Court, E.D. Kentucky.

Aug. 31, 2001.

---

1. 29 U.S.C. § 254.

 

David Marye, Assistant U.S. Attorney, Lexington, KY, for plaintiff.

Stephen Romines, Louisville, KY, for defendant, Octavio Correa–Gomez.

Willis G. Coffey, Mt. Vernon, KY, for defendant, Miguel Correa–Gomez.

### MEMORANDUM OPINION AND ORDER

WILHOIT, Senior District Judge.

This matter is before the Court on the defendant's motion to dismiss the indictment [Record No. 69] for selective prosecution. The motion has been the subject of multiple rounds of briefs and the Court is further benefitted by the oral arguments of counsel on four occasions. For the reasons set forth herein, the defendant's motion will be GRANTED.

### I. Factual Background

Octavio Correa–Gomez is charged with seven counts of violating 8 U.S.C. § 1324(a)(1)(A). Essentially, the indictment alleges that Mr. Correa–Gomez encouraged and induced seven illegal aliens to enter the United States and harbored them during their tenure as employees at his restaurants of Central and Northern Kentucky. Of the seven illegal aliens named in the indictment, five presented fraudulent cards which indicated their status as legal aliens. The remaining illegal aliens named in the indictment have stated that they were either hired by Mr. Correa–Gomez's co-defendant or that they did not know the defendant.

On May 18, 2001, the defendant filed a motion to dismiss the indictment for selective prosecution. After considering the government's response and holding a hearing on May 22nd, the motion was taken under advisement. At a second hearing on May 29th, the motion to dismiss and the necessity of discovery on the motion was again discussed. The Court allowed

Mr. Correa–Gomez until July 2nd to determine if there was enough evidence to warrant formal discovery·on the issue of selective prosecution. On June 29th, the defendant formally moved for discovery of certain information pertaining to the selective prosecution issue. The Court held a third hearing on August 6, 2001 wherein the motion to dismiss was discussed. After considering the arguments of counsel and the factors articulated in *United States v. Armstrong*, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), the Court determined that discovery on the issue of selective prosecution was necessary. Accordingly, the government was ordered to produce records of all Immigration and Naturalization Service ("INS") raids within the Eastern District of Kentucky from 1996 to present. On August 17th, the government filed under seal a chart listing: 1) the raids that have occurred during that period; 2) the ethnicity of the owner of the business raided; 3) the ethnicity of the illegal aliens; and 4) the disposition of the case. After supplemental briefs were filed, the Court held a fourth hearing on the motion to dismiss on August 27, 2001. The Court considered the arguments of counsel and took the motion to dismiss under advisement.

## II. Standard of Review

In *United States v. Armstrong*, the Supreme Court held that "a selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). The Court also indicated that " 'the presumption of regularity supports prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume they have properly discharged their official duties.' " *Id.* To overcome the presumption, the defendant must therefore present "clear evidence to· the contrary." *Id.* at 465, 116 S.Ct. 1480.

In the ordinary case, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." Of course, a prosecutor's discretion is "subject to constitutional constraints." One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, is that the decision whether to prosecute may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification." A defendant may demonstrate that the administration of a criminal law is "directed so exclusively against a particular class of persons ... with a mind so unequal and oppressive" that the system of prosecution amounts to "a practical denial" of equal protection of the law. *Id.*, at 464–65, 116 S.Ct. 1480; *See also Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir.2000).

■ In a selective prosecution claim, the claimant's burden is twofold. First he must demonstrate that the federal prosecutorial policy had a discriminatory effect and, second, that it was motivated by a discriminatory purpose. *See Armstrong*, 517 U.S. at 465, 116 S.Ct. 1480. Both elements must be proven by clear and convincing evidence. *See United States v. Smith*, 231 F.3d 800, 808 (11th Cir.2000).

■ Discriminatory effect is proven by showing that "similarly situated individuals of a different race were not prosecuted." *Id.; see also Ah Sin v. Wittman*, 198 U.S. 500, 25 S.Ct. 756, 49 L.Ed. 1142 (1905); *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (holding that disparate impact is sufficient to show a

discriminatory effect). In *United States v. Smith*, the Court of Appeals elaborated on the first prong of the *Armstrong* test by defining a "similarly situated" person for selective prosecution purposes as:

> One who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan and against whom the evidence was as strong or stronger than that against the defendant.

*Id.* at 810. Furthermore, the mere possibility of future prosecutions "is not a sufficient basis upon which to find that he requisite discriminatory effect of selectivity showing has not been clearly proven." *Smith*, 231 F.3d at 809.

■■■ " '[D]iscriminatory purpose' ... implies more than ... intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte v. United States*, 470 U.S. 598, 610, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). "Proof of discriminatory intent must necessarily usually rely on objective factors, several of which were outlined in *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450. The inquiry is practical. What a legislature or any official entity is 'up to' may be plain from the results its actions achieve, or the results they avoid." *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). Where direct evidence of discriminatory purpose is unavailable, the alleged unconstitutional purpose must be examined in the context of: 1) disparate impact; 2) historical background; 3) specific events leading up to the challenged decision; and 4) any associated legislative or administrative history. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–67, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

The Sixth Circuit has adapted the traditional Equal Protection Clause analysis by refashioning the pertinent inquiry into a three prong test. *See United States v. Anderson*, 923 F.2d 450 (6th Cir.1991). In the Sixth Circuit, a defendant is selectively prosecuted in an unconstitutional manner when: 1) he is singled out as a person belonging to an identifiable group for prosecution even though others similarly situated have not been prosecuted; 2) the prosecution was initiated with a discriminatory purpose; and 3) the prosecution must have a discriminatory effect on the group to which the defendant belongs. *See id.* at 453. This inquiry naturally requires the delicate balancing of the strong presumption of prosecutorial discretion against the indefatigable principal of equal protection. "It is a venerable rule under the Equal Protection Clause that the state may not choose to enforce even facially neutral laws differently against different portions of the citizenry solely out of an arbitrary desire to discriminate against one group." *Stemler v. City of Florence*, 126 F.3d 856, 874 (6th Cir.1997) (dismissing indictment for selective prosecution on the basis of sexual orientation); *see also United States v. Navarro–Camacho*, 186 F.3d 701, 711 (6th Cir.1999) ("In such cases where an investigatory practice has a discriminatory purpose and a discriminatory effect, the indictment should be dismissed.") (Moore, J., concurring).

### III. Discussion

■■ An in-depth survey of the United States Code reveals no law impinging upon

the right of an employer to assist lawful employees in meeting their housing needs. This point is conceded by the government and is vital to understanding the defendant's ultimate position.

At its most basic level, this case boils down to the timeless dual question of "how much did he know and when did he know it?" The government will seek to prove at trial that the defendant was calculating and greedy. The defense will no doubt paint a softer portrait of a businessman attempting to lawfully give others a fresh start in a new country. Determining which portrayal of Mr. Correa–Gomez is most accurate is the province of the jury, but only to the extent that the government has not pursued this prosecution on unconstitutional grounds in the first instance.

Between 1996 and 2000, the Immigration and Naturalization Service has conducted seventeen raids against businesses within the Eastern District of Kentucky. Fourteen of these businesses, more than eighty-two percent, are either publicly held corporations or are owned and managed by non-Hispanics. The raids of these businesses resulted in the apprehension of 218 illegal aliens. One hundred ninety-nine of these aliens presented false cards to their employer at the time they were hired. The remaining nineteen illegal aliens had no paperwork whatsoever. In the cases involving illegal aliens without paperwork, the employer either never asked about the worker's immigration status, or, in one case, actually knew of the workers' illegal status. The sum total of these raids is six fines, six warnings and zero criminal prosecutions. Although one case was presented for prosecution, the request was denied.

Aside from the fact that he has been prosecuted, Mr. Correa–Gomez's case is factually unremarkable when compared to those similarly situated to him. When INS raided two of his restaurants they apprehended fourteen illegal aliens. Nine of these illegal aliens, gave false cards to the defendant at the time of their hiring while three stated that they either didn't know Mr. Correa–Gomez, that they had been hired by someone else, or that they had lied about their immigration status. These facts indicate that the defendant was similarly situated to those non-Hispanic business owners who have not been charged with criminal wrongdoing.

In order to convict for any § 1324(a) crime, the government must prove beyond a reasonable doubt that the defendant acted with the requisite mental state. *See e.g. United States v. Parmelee,* 42 F.3d 387, 390 (7th Cir.1994) (defendant's knowledge is an essential element of the government's case); *United States v. Mussaleen,* 35 F.3d 692, 698 (2nd Cir.1994) (proving reckless disregard satisfies *mens rea* for 8 U.S.C. § 1324(a) violation). As the government admits, the illegal alien's presentation of paperwork that appears genuine is an affirmative defense.

Good faith compliance with the prescribed verification procedures is an "affirmative defense" to a charge that one has hired or recruited unauthorized aliens. The legislative history explains how the IRCA affirmative defense works as follows. If an employer proves that he checked the required documents and retained the attested verification forms, he has established a "rebuttable presumption" that he did so in "good faith." At this point the burden shifts to the government to prove lack of good faith. It should be noted that this is not an absolute defense, and the government could rebut the presumption by offering proof that the documents did not reasonably appear on their face to be genuine, that the verification process was pretextual, or that the employer ... colluded with the employee in falsifying documents, etc. Of course, even if the employer does not seek to establish an

affirmative defense, the burden of proving a violation of the hiring, recruitment, or referral prohibition always remains on the government—by a preponderance of the evidence in the case of civil penalties and beyond a reasonable doubt in the case of criminal penalties.

*Garcia v. Secretary of Labor,* 10 F.3d 276, 283–284 (5th Cir.1993) (citations and footnote omitted).

The benefit of this rebuttable presumption has been extended to every business owner prior to Mr. Correa–Gomez. Why, then, has the same presumption not been extended to such a similarly situated defendant here? The defendant is by all accounts a true American success story. As a legal immigrant to this country, he has established and built a chain of successful restaurants throughout the region. He has contributed to society through his restaurants and other service. Yet in proceeding against Mr. Correa–Gomez as a criminal, the government has elected to not give him the same benefit of the doubt that it has extended to other, similarly situated, non-Hispanic business owners. Such an election confirms that the defendant has been singled out for prosecution.

The question of discriminatory purpose is difficult to probe. It involves an inquiry into whether the government acts "because of," the defendant's status rather than "in spite of," his status. *See Wayte,* 470 U.S. at 610, 105 S.Ct. 1524. In the absence of direct evidence of a discriminatory purpose underlying the government's decision to prosecute this case, the Court must revert to the time-tested factors of *Village of Arlington Heights.* While there is no legislative or administrative history associated with the decision to prosecute, the impact, background and events leading up to this prosecution are viewed as significant by the Court. Reviewing the government's disclosures, it becomes apparent that this defendant is not unlike those whom the government has chosen to simply fine or warn. The prosecution of this defendant will have some deterrent effect as to all business owners, but its impact will be most chilling to Hispanic business owners who must rely upon the apparent genuineness of the work papers and verification cards presented to them by prospective workers. Furthermore, the government's unwillingness to proceed against the defendant administratively indicates a heightened level of prosecutorial awareness not present in previous cases presenting similar facts. This awareness is made more critical by the government's admission that at the time the decision to prosecute was made, this was believed to be a first offense. The stark and dramatic difference between this case and previous cases demonstrates that something other than the allegation of his employment of illegal aliens motivated the government's decision to prosecute Mr. Correa–Gomez. When a facially neutral law is applied in a selective and inequitable manner, the very foundation of the rule of law is challenged. *See Stemler v. City of Florence,* 126 F.3d 856, 874 (6th Cir.1997) (reversing the district court and dismissing an indictment for selective prosecution).

The government argues that there is no discriminatory effect associated with prosecuting Mr. Correa–Gomez. They point out that in these prior cases where the businesses were raided and illegal aliens were found, the employers were punished through administrative fines. A raid resulting in an invasion of the "petty cash" drawer is in no way as invasive as a raid resulting in potential incarceration. Most troubling to the Court is an incident involving the G.F. Vaughn Tobacco Warehouse. The representations of the government's counsel indicate that the Immigration and Naturalization Service identified the warehouse as a likely employer of illegal aliens. Even prior to

executing an immigration raid, however, the decision was made by INS supervisors to deal with any discovered violations on an administrative level only. When the raid took place and eighty-seven (87) illegal aliens were captured, INS agents requested permission to present the case to prosecutors as a possible criminal matter. The request was denied by supervisors and the Caucasian warehouse owner was "off the hook" with only an administrative fine.

The government defends its actions in the Vaughn matter on two grounds. First, the government points out that as many as eighty of the eighty-seven illegal aliens possessed false cards—thereby entitling the warehouse owner to the presumption of acting without the required *mens rea.* Second, the government argues that it wished to make an example of Vaughn with an eye towards deterring other offenders. These hindsight justifications are illusory and belittle the travesty of immigration enforcement. As the facts of this case make abundantly clear, every illegal alien alleged in the indictment in the case at bar also possessed fraudulent work cards or denied the defendant's role in their hiring. Similarly, the credibility of a stated desire to maximize deterrence by "creating an example" is severely undercut by the subsequent failure to seek prosecution. The deterrent value of a criminal prosecution far exceeds the rather mundane collection of an administrative fine. Most stunning, however, is the government's admission that INS officials affirmatively predetermined the appropriate punishment for offenses which had not yet been uncovered. The discriminatory effect of such a prosecutorial policy is disenchantingly evident.

Based upon the principles articulated in *Armstrong* and *Anderson,* the Court is convinced that this defendant should not have been prosecuted. The government would distinguish its previous immigration raids by arguing that Mr. Correa–Gomez was harboring illegal aliens. This argument, however, presupposes the defendant's guilty knowledge. In not extending the benefit of the doubt to Hispanic restaurant owners, the government places them in the precarious position of being unable to rely upon the law's shelters while laboring well within the striking distance of the prosecutor's sword. Under the same presumption extended to every other non-Hispanic employer, the actions of Mr. Correa–Gomez in facilitating the livelihood of his workers is laudable—not unlawful.

### IV. Conclusion

Having reviewed the record and being otherwise sufficiently advised, **IT IS HEREBY ORDERED:**

1. that the defendant's motion to dismiss the indictment [Record No. 69] is **GRANTED;**

2. that all remaining motions are **DENIED as MOOT;**

3. that this indictment shall be **DISMISSED WITH PREJUDICE;**

4. that this case shall be **STRICKEN** from the docket; and

5. that this is a final and appealable order.