# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | I.D. No. 83000508DI |
| | ) | |
| | ) | |
| ALAN BASS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Submitted: February 25, 2022
Decided: June 10, 2022

*Upon Consideration of the Commissioner's Report and Recommendation on Defendant's Motion for Postconviction Relief,*
**ADOPTED**.

*Upon Consideration of Defendant's Appeal from the Commissioner's Report and Recommendation on Defendant's Motion for Postconviction Relief,*
**DENIED.**

Maria T. Knoll and Brian L. Arban, Deputy Attorneys General, Department of Justice, Wilmington, Delaware. *Attorneys for the State.*

Patrick J. Collins, Esquire of Collins & Price, Wilmington, Delaware. *Attorney for Defendant.*

**MEDINILLA, J.**

# INTRODUCTION

In 1983, Alan Bass ("Defendant") received five life sentences plus forty-five years[1] for rapes, kidnappings, robberies, and burglaries committed in Wilmington and Claymont between November 1981 and August 1982. Today, he seeks a new trial or the dismissal of his indictment. With the assistance of appointed counsel, he brings this seventh Motion for Postconviction Relief under Superior Court Criminal Rule 61, where he claims actual innocence and raises two separate and distinct constitutional due process challenges under the 14th Amendment to the U.S. Constitution.[2] The Court has considered all relevant pleadings,[3] the Commissioner's Report and Recommendation,[4] the sentence imposed upon Defendant, and the record in this case.[5] For the reasons set forth herein, the Commissioner's Report and Recommendation are **ADOPTED.** Defendant's Motion for Postconviction Relief is **DENIED**.

---

[1] Sentence, D.I. 26.

[2] *See* Defendant's Motion for Postconviction Relief, D.I. 127 [hereinafter Motion].

[3] *See* Motion; State's Response to Defendant's Motion for Postconviction, D.I. 134; Defendant's Reply, D.I. 135; Defendant's Letter to Supplement the Record, D.I. 136; State's Response to Defendant's Supplemental Submission, D.I. 141; Defendant's Supplemental Memorandum, D.I. 150; State's Supplemental Response, D.I. 155; Defendant's Reply to State's Supplemental Response, D.I. 156; Defendant's Appeal from Commissioner's Findings of Fact and Recommendations, D.I. 165 [hereinafter Defendant's Appeal]; State's Response to Defendant's Appeal of Commissioner's Report and Recommendation, D.I. 169 [hereinafter State's Response].

[4] *See* Commissioner's Report and Recommendation, D.I. 161 [hereinafter Comm'r Report].

[5] While the trial was being transcribed, some of the stenographer's notes were lost in a storm and were reconstructed with the notes of the prosecutors. Also, the trial was transcribed without opening statements or closing arguments. The Supreme Court previously determined that the loss of the stenographer's notes did not warrant a new trial. *See Bass v. State*, 720 A.2d 540 (Del. 1984).

## FACTUAL BACKGROUND[6]

To best understand Defendant's Motion, the Court begins with the three separate incidents that formed the bases of these charges and convictions.

### A. November 1981 Assault #1 (S.K.)

On November 10, 1981, 20-year-old victim S.K. was working alone at a North Wilmington law office at 7:00 PM when she saw a black male enter the office.[7] The man ran over to her, stuck an object into her side and demanded money.[8] He forced her to hang up the phone and took some petty cash. He then went through her purse and took her watch and jewelry.[9]

The assailant then forced her into a conference room in the law office and ordered her to lift her sweater and cover her face.[10] The assailant tied up her feet, forced her to unbutton her pants, and raped her vaginally for twenty to thirty seconds.[11] He had difficulty maintaining an erection and did not ejaculate.[12] Victim S.K. caught a glimpse of his face when her assailant permitted her to remove the sweater from her face.[13] He went to another room and returned with a different

---

[6] For confidentiality purposes, the victims will be referred to by their initials or as victims one, two or three.

[7] *See* Comm'r Report, at 9; Motion, at 3.

[8] *See* Comm'r Report, at 9; Motion, at 3.

[9] *See* Comm'r Report, at 9; Motion, at 3.

[10] *See* Comm'r Report, at 10; Motion, at 4.

[11] *See* Comm'r Report, at 10; Motion, at 4.

[12] *See* Comm'r Report, at 10; Motion, at 4.

[13] *See* Comm'r Report, at 10; Motion, at 4.

sweater to put over her head again.[14]  He covered her face and gagged her mouth with that sweater, tied her hands behind her back, and left.[15]  Police later found a screwdriver in the conference room where she was raped.[16]

### B. July 1982 Assault #2 (A.S.)

On July 10, 1982, 26-year-old victim A.S. was working alone on the third floor of an office at an insurance company in Claymont.[17]  A black man entered the office at approximately 9:30 AM holding a screwdriver and wearing dark glasses and a cardigan sweater over his head,[18] covering the sides of his face and hair.[19]  She saw him for ten to thirty seconds before he approached her.[20]  He shoved the screwdriver into her side and forced her to look at the floor.[21]  After demanding money, he emptied her purse, and gagged her by tying his sweater over her head.[22]  She could only see his gray shoes as he forced her into a conference room.[23]

Thereafter he demanded her wedding and engagement rings which she begged him not to take.[24]  Her assailant then threatened to kill her, punched her in the face,

---

[14] *See* Comm'r Report, at 10; Motion, at 4.
[15] *See* Comm'r Report, at 10; Motion, at 4.
[16] Defendant's Appendix, Trial Testimony of Officer Alstadt, at A198:13-23.
[17] *See* Comm'r Report, at 13; Motion, at 5.
[18] *See* Comm'r Report, at 13; Motion, at 5.
[19] Defendant's Appendix, Trial Transcript of A.S., at A223:14-23.
[20] *See* Comm'r Report, at 13; Motion, at 5
[21] *See* Comm'r Report, at 13; Motion, at 5.
[22] *See* Comm'r Report, at 13; Motion, at 5.
[23] *See* Comm'r Report, at 14; Motion, at 5.
[24] *See* Comm'r Report, at 14; Motion, at 6.

took her rings, and tied her hands and feet.[25] He then removed her clothes from the waist down, undressed himself, and raped her vaginally for about sixty to ninety seconds.[26] He had trouble penetrating her and maintaining an erection.[27] After this time period of penetration, he seemed disgusted, gave up and said "forget it."[28] He then dressed her and himself, retied her hands and feet, covered her with a raincoat, and left.[29]

### C. August 1982 Assault #3 (S.M.)

Six weeks prior to her attack, on July 16, 1982, 30-year-old victim S.M. attended an office party hosted by her employer in North Wilmington where her wallet and personal checks were stolen.[30] Two of the stolen checks were forged and cashed.[31]

On the morning of August 26, 1982, she was alone in her office when a male assailant approached her from behind and covered her mouth.[32] When she asked what he wanted, he told her to shut up and asked if she had money.[33] She responded that she did not.[34] After a few exchanges wherein she tried to convince him that

---

[25] *See* Comm'r Report, at 14; Motion, at 6.
[26] *See* Comm'r Report, at 14–15; Motion, at 6.
[27] *See* Comm'r Report, at 15; Motion, at 6.
[28] *See* Comm'r Report, at 15; Motion, at 6.
[29] *See* Comm'r Report, at 15; Motion, at 6.
[30] *See* Comm'r Report, at 17; Motion, at 9.
[31] *See* Comm'r Report, at 19; Motion, at 9.
[32] *See* Comm'r Report, at 19; Motion, at 7.
[33] *See* Comm'r Report, at 19; Motion, at 7.
[34] *See* Comm'r Report, at 19.

someone else was in the office,[35] he forced her into a windowless lab room and struck her on the head.[36] She tried to persuade him that the police were on the way because her purse had been stolen.[37] After accusing her of lying,[38] he became angrier, ordered her to kneel[39] and to shut up.[40] At some point during the attack, she lost control of her bladder and urinated.[41] Shortly thereafter, she heard her assailant walk out of the room.[42] After she managed to stand, she locked herself in the office and called the police.[43] She never saw his face.[44]

## PROCEDURAL BACKGROUND – TRIAL

The evidence presented at trial included, but was not limited to, the assailant's race, height, build, voice, facial features, clothing, and shoes. The State called various witnesses at trial that testified about the identification of the assailant and the similarities of the three incidents. These witnesses included law enforcement, the victims, two eyewitnesses, and a long-time friend of Defendant. Two witnesses positively identified Defendant at trial as the assailant, including one of the victims.

---

[35] *See id.*; Motion, at 7.
[36] *See* Comm'r Report, at 20; Motion, at 7.
[37] *See* Comm'r Report, at 19–20; Motion, at 7.
[38] Motion, at 7.
[39] *See id.*; Comm'r Report, at 19–20.
[40] Motion, at 7.
[41] Comm'r Report, at 20.
[42] *See id.*; Motion, at 7.
[43] *See* Comm'r Report, at 20; Motion, at 7.
[44] *See* Comm'r Report, at 22; Motion, at 8.

## A. Testimony of Victims

At trial, first victim S.K. (who caught a glimpse of the assailant's face when she removed the sweater from her face after the rape) unequivocally identified Defendant as her attacker at trial.[45] She told the jury that her attacker was a black male with a dark complexion, slender, 20 to 30 years old, 5'8" to 5'10", possibly with a mustache, and with a deep, soft-spoken voice.[46] She further described him as tall and thin.[47] She recalled that he wore a hat, sunglasses, a sport coat, a turtleneck, and dark pants.[48]

Before trial, she was unable to identify her assailant from a physical lineup.[49] Defendant was not in that lineup.[50] She also did not make any positive identifications from a photo lineup although Defendant's photo was included,[51] and she thought one or more of the men resembled her assailant.[52] She was cross-examined about her inability to identify Defendant pre-trial.[53] On re-direct, she

---

[45] *See* Defendant's Appendix, Trial Testimony of S.K., at A155:2-15.
[46] *Id.* at A116:12-18.
[47] *Id.* at A136:11-17.
[48] *Id.* at A136:5-10.
[49] Defendant's Appendix, Trial Testimony of Officer Waggaman, at A188:10-16.
[50] *Id.* at A188:12-13.
[51] Defendant's Appendix, Trial Testimony of S.K., at A170:14-18; Defendant's Appendix, Trial Testimony of Officer Waggaman, at A193:17-19.
[52] Defendant's Appendix, Trial Testimony of S.K., at A169:1-4; A193:11-16.
[53] *See id.* at A168:15-A172:12.

7

offered the jury an explanation as to why she was unable to identify Defendant until trial.[54]

At trial, the second victim, A.S., who had seen her attacker for ten to thirty seconds before he approached her, described her assailant as a thin black male with a small hair growth on his chin, early thirties, 5'11" to 6'0", with a medium complexion,[55] and that Defendant "resembles the person who attacked me."[56] Through two photo lineups in July 1982 and October 1982, this victim had narrowed the identification to two individuals, to include Defendant, but was unable to make a positive identification.[57] At trial, she stated that Defendant's height and build were similar but that her attacker was thinner and did not have a mustache.[58] The State elicited testimony from law enforcement that Defendant had gained 15 to 20 pounds since his arrest.[59]

A.S. also testified that she saw the assailant's gray shoes as he forced her into a conference room.[60] She further described them as a gray slip-on type[61] "that had a

---

[54] *See id.* at A174:7-15 ("Because I don't think photographs really show it all. I think if I had got to see him in person before, I would have – I have the picture clearly in my mind to this day with the glasses and the hat.").

[55] Defendant's Appendix, Trial Testimony of A.S., at A224:10-A225:8.

[56] *Id.* at A249:7-8.

[57] Defendant's Appendix, Trial Testimony of Detective Castelline, at A307:6-A312:1.

[58] Defendant's Appendix, Trial Testimony of A.S., at A249:15-A250:7.

[59] Defendant's Appendix, Trial Testimony of Detective Dressel, at A325:11-A326:2.

[60] Defendant's Appendix, Trial Testimony of A.S., at A225:13-15; A229:7-9.

[61] *Id.* at A225:12-A226:11.

8

suede top, and what [she] thought was some kind of soft crepe sole."[62] The State provided a pair of Defendant's shoes at trial, but this victim was unable to identify them as belonging to her attacker.[63]

The third victim S.M. never saw her attacker's face[64] and was not able to positively identify Defendant. But she testified that her attacker was 5'10" to 6'0" and had a thin build with long, thin black fingers, a blue shirt, and a calm voice.[65] Though no witnesses were present during her attack, the jury heard from two eyewitnesses who were in the same office building on the day of the attack. Both provided evidence favorable to the State.

## B. Testimony of Additional Eyewitnesses

One of these two eyewitnesses was Roger Reynolds, a building manager in the office building where the third victim, S.M., was assaulted.[66] He testified that shortly after the attack, he received a call from police and began looking around the building.[67] Mr. Reynolds noticed a man located in a bathroom stall of the men's restroom about thirty feet away from S.M.'s office.[68]

---

[62] *Id.* at A226:2-3.

[63] A.S. testified the shoes were the same unusual gray color and slip-on, but the shoes at trial were a dull leather and not the suede she remembered from her attack. *See id.* at A244:20-A245:15.

[64] Defendant's Appendix, Trial Testimony of S.M., at A376:5-6.

[65] *Id.* at A374:19-A376:2.

[66] Defendant's Appendix, Trial Testimony of Roger Reynolds, at A386:15-A387:2.

[67] *Id.* at A390:5-19.

[68] *Id.* at A390:17-22.

While in the stall, it appeared that this man's pants were up, he was not using the toilet, and his shoes were clearly visible.[69] He described the man as black, about 6'0" tall, with facial hair, and wearing gray suede shoes with a flat sole and heel.[70] When shown the same gray shoes which were presented to second victim A.S., Mr. Reynolds stated they "looked like the same shoes"[71] as those worn by the man in the bathroom stall. Although he acknowledged that he did not see the man's entire face, he selected an individual from a photo lineup based on the "definite formation" of the forehead.[72] He selected a photo of Defendant.[73]

The second eyewitness, Christine Shaw, testified that on the morning of the third assault she passed a man in the hallway who was exiting the office where the attack occurred.[74] She described him as a neatly dressed tall black man, who stood about 5'10" and 130 pounds, approximately 30 years old, wearing a blue shirt and blue tweed pants, with glasses, and a "short to medium afro."[75] She told the police that he was clean shaven but at trial could not definitively say whether or not he had a mustache.[76] She said that she saw him walk toward her down a hallway for about

---

[69] *Id.* at A391:1-10.
[70] *Id.* at A391:1-A393:2.
[71] *Id.* at A394:13.
[72] *Id.* at A393:3-21.
[73] Defendant's Appendix, Trial Testimony of Detective Castelline, at A453:5-13.
[74] Defendant's Appendix, Trial Testimony of Christine Shaw, at A428:13-A429:15.
[75] *Id.* at A429:4-9; A430:17-20.
[76] *Id.* at A434:14-A435:4.

10

one minute and that he said "hello" as he passed her.[77]  Ms. Shaw positively identified Defendant in a photo lineup,[78] testifying that when viewing the photo lineup she recognized the picture of the man "as soon as [she] saw the picture,"[79] and did not have any doubt that she selected the correct individual.[80]  She also unequivocally identified Defendant at trial.[81]

### C. Testimony of Long-Time Friend, Loretta Schoell

After receiving immunity from the State, Defendant's friend, Loretta Schoell, testified that she had known Defendant for about 11 years,[82] and described him as being "like a member of [her] family."[83]  She told the jury that Defendant had lived with her at Stoneybrook Apartments in Claymont from October to December of 1981, and again from June to September of 1982,[84] coinciding with when the three assaults took place—November 1981, July 1982, and August 1982.

The two of them engaged in cash stealing schemes and targeted offices to commit thefts, including the offices where the assaults of victims two and three occurred in July and August of 1982.[85]

---

[77] *Id.* at A430:8-15.
[78] Defendant's Appendix, Trial Testimony of Detective Castelline, at A453:5-13.
[79] Defendant's Appendix, Trial Testimony of Christine Shaw, at A433:15-16.
[80] *Id.* at A433:17-18.
[81] *Id.* at A433:19-A434:5.
[82] Defendant's Appendix, Trial Testimony of Loretta Schoell, at A340:11-15.
[83] *Id.* at A343:13-14.
[84] *Id.* at A340:16-341:17.
[85] When he was not living in Delaware with his long-time friend, he was living out of state.

She testified that on July 16, 1982 (when S.M. attended her office party), they went to S.M.'s office building and Defendant went inside while she waited in the car.[86] According to Ms. Schoell, Defendant returned after approximately twenty minutes with S.M.'s checks.[87] Ms. Schoell forged and cashed two of them.[88] The jury also heard testimony about a stolen dictating machine found in Ms. Schoell's car, matching the description of the same model stolen from the second victim's (A.S.'s) workplace and belonging to one of her co-workers.[89] Ms. Schoell testified that Defendant gave her a stolen check from the same co-worker eight days before victim A.S. was raped.[90] She also stated that Defendant dressed "like an office worker"[91] so he would fit in with an office environment.[92] Lastly, she confirmed the same gray shoes shown to A.S. and Mr. Reynolds belonged to Defendant.[93]

### D. Testimony of Defendant

Defendant elected to testify, asserting that he did not attack the three women.[94] He admitted to stealing personal checks and other valuables but could not recall

---

[86] *Id.* at A350:3-4.

[87] *Id.* at A350:3-7.

[88] *Id.* at A347:11-A348:9.

[89] Defendant's Appendix, Trial Testimony of William Stevens, at A337:1-18; Defendant's Appendix, Trial Testimony of William Stevens, at A334:7-11.

[90] Defendant's Appendix, Trial Testimony of Loretta Schoell, at A344:9-A345:6; A337:19-A339:1.

[91] *Id.* at A354:22.

[92] *Id.* at A355:1-2.

[93] *Id.* at A357:20-A358:12.

[94] Defendant's Appendix, Trial Testimony of Defendant, at A535:20-A536:10.

where he had committed the thefts.[95] He testified that he had not worked for years and had supported himself by stealing from office buildings.[96] When he committed these thefts, he would not speak to anyone when leaving the location,[97] and never returned to those office buildings.[98]

### E. Testimony of Hair Analysis Expert

Before trial, articles of clothing from the two sexual assault victims (S.K. and A.S.) were submitted to the FBI for a hair comparison analysis.[99] The FBI conducted a Microscopic Hair Comparison ("MHC") analysis where an agent compared hair evidence found on the victims' clothing with hair samples taken from Defendant.

At trial, the State put on the expert testimony of a hair examiner from the Federal Bureau of Investigation ("FBI"). FBI forensic examiner Andrew Gary Podolak ("Podolak") testified about the results of this hair analysis, stating MHC allows an association to be made between a hair and a particular individual because of the unique characteristics of the hair.[100] Specifically, Podolak testified that he "tr[ies] to make an association between [the] hairs and the particular individual"[101]

---

[95] *Id.* at A523:11-524:10.
[96] *Id.* at A518:16-520:13.
[97] *Id.* at A527:16-19.
[98] *Id.* at A527:3-9.
[99] As the third female victim was not sexually assaulted a hair comparison analysis was not performed for her attack.
[100] Defendant's Appendix, Trial Testimony of Agent Podolak, at A473:4-A474:3.
[101] *Id.* at A28:11-12.

and he likened hair comparison to that of a human face where the "uniqueness to the hair . . . allows . . . an association of that hair to a particular individual."[102]

On June 13, 1983, the jury returned guilty verdicts against Defendant on all charges to include two counts of Rape First Degree, three counts of Kidnapping First Degree, two counts of Robbery First Degree, one count of Attempted Robbery First Degree, two counts of Burglary Second Degree, and one count of Burglary Third Degree.[103]

## POST TRIAL

On appeal, in September 1985, the Supreme Court affirmed Defendant's conviction.[104] He has since filed six (6) *pro se* motions for postconviction relief.[105] All have been denied or dismissed.[106]

Since then, the FBI, along with the United States Department of Justice ("USDOJ") have been engaged in a years-long review of MHC reports and testimony provided by FBI forensic examiners from cases before December 31,

---

[102] *Id.* at A34:14-A35:3.
[103] Jury Found Defendant Guilty as Charged, D.I. 11.
[104] *See Bass v. State*, 505 A.2d 451 (TABLE) (Del. 1985) No. 14, 1984, slip op. (Del. Sept. 20, 1985). On appeal, the Supreme Court also considered Podolak's testimony regarding findings of an MHC study and found that testimony was properly admitted at trial.
[105] *See* D.I. 46; D.I. 58; D.I. 74; D.I. 86; D.I. 100; D.I. 113.
[106] *See* D.I. 51; D.I. 63; D.I. 77; D.I. 91; D.I. 106; D.I. 124.

1999.[107] The review focuses on cases where improper trial testimony overstated the conclusions that may have been drawn from hair comparison analysis.[108]

In June 2015, the USDOJ notified the Delaware Department of Justice that the FBI's review determined Podolak's testimony of the MHC evidence in Defendant's case "included statements that exceeded the limits of science."[109] Following the USDOJ's disclosure, the Office of Conflicts Counsel assigned postconviction counsel to Defendant.[110]

## THE POST CONVICTION CLAIMS

With the assistance of counsel, on April 26, 2018, Defendant filed this present Motion for Postconviction Relief ("Rule 61 Motion") raising both actual innocence and constitutional violations as the bases for relief. As his remedy, he seeks either a new trial or dismissal of the indictment.

In support of a new trial, he argues that new evidence establishes a claim of actual innocence under Rule 61. Specifically, he claims the USDOJ/FBI's 2015 acknowledgment regarding the limitations of the MHC testimony is the new evidence which creates a strong inference that he is actually innocent in fact of the acts underlying the charges of which he was convicted.[111] He claims that without

---

[107] Defendant's Appendix, U.S. Dept. of Justice Letter, dated June 25, 2015, at A17.
[108] *Id.*
[109] *Id.* at A18.
[110] Motion, at 25.
[111] *Id.* at 29–31.

15

this impermissibly admitted testimony, the State's remaining evidence is insufficient to satisfy a conviction.[112] Coupled with this argument is his 14th Amendment claim that the State's use of this unreliable hair evidence violated his right to a fair trial.[113]

In support of dismissal, he supplements his initial Rule 61 Motion and further asserts that the State's failure to dismiss his indictment in light of the erroneous MHC testimony is constitutionally impermissible. This second due process claim focuses on the Attorney General's prosecutorial decision to dismiss an indictment under Rule 48(a) in *State v. Daniels*.[114] He argues that in *Daniels*, the State properly considered and justly responded to the invalid MHC evidence. But that the State's failure to afford him the same relief demonstrates disparate treatment, a violation of his due process rights.[115] In sum, he asks the Court to do what the State failed to do and dismiss his case.

The State filed its Response on August 9, 2018, and Defendant filed his Reply on September 5, 2018. Defendant's Rule 61 Motion was referred to Superior Court Commissioner Lynne Parker ("Commissioner") pursuant to 10 *Del. C.* § 512(b) and Superior Court Criminal Procedure Rule 62(a)(5).

---

[112] *See generally* Defendant's Supplemental Memorandum, D.I. 150. See below for discussion of the mtDNA analysis.
[113] *See* Motion, at 28–29.
[114] ID No. 87002394DI.
[115] *See generally* Defendant's Supplemental Memorandum, D.I. 150.

16

The Commissioner scheduled an evidentiary hearing in January 2019 but postponed it when it was learned that hair evidence from the trial was available for new testing. Both sides stipulated to resend the hair evidence to the FBI,[116] for additional hair comparison analysis (MHC) and mtDNA testing.[117]

For the MHC analysis, the results concluded that Defendant was "a possible source of [the] hair."[118] For the mtDNA testing, the FBI concluded that for first victim S.K., Defendant "cannot be excluded as the source" of the hair because both samples fall within the same sequence range.[119] The samples provided for the second victim, A.S., were not able to be interpreted due to "mixtures of mtDNA" being present.[120]

The State maintained that sufficient non-MHC evidence exists to support the conviction, that the constitutional challenges were meritless, and that the alleged "new evidence" was only partially new where limitations of hair analysis have been known for a long time.[121] Moreover, it argued that Defendant's claims remain

---

[116] *See* Comm'r Report, at 28; Defendant's Appeal, at 30; State's Response, at 4.
[117] mtDNA testing was performed because the sample was insufficient for nuclear DNA analysis.
[118] *See* Appendix to State's Supplemental Response to Defendant's Motion for Postconviction Relief, at B132.
[119] Defendant's Appendix, FBI Laboratory Report, at A1037; *see also id.* at A1038 ("[i]f the samples have the same sequence . . . they cannot be excluded as coming from the same source.").
[120] *Id.* at A1038.
[121] State's Response to Defendant's Motion for Postconviction, D.I. 134, at 17.

procedurally barred where the 2019 retesting evidence fails to exonerate Defendant.[122]

## COMMISSIONER'S REPORT AND DEFENDANT'S APPEAL

With the supplement of the 2019 FBI results, the Commissioner resumed consideration of the Rule 61 Motion. On December 15, 2021, the Commissioner issued her Report and Recommendation ("Report") concluding that Defendant's Rule 61 Motion should be denied.[123]

On January 26, 2022, Defendant appealed, arguing that the Report: (1) overstates the strength of the State's case; (2) minimizes the effect of Podolak's false testimony on the jury; (3) overstates the significance of the mtDNA evidence; and (4) improperly finds that the Rule 61 Motion fails to overcome the procedural bar of Rule 61(d)(2).[124] The State seeks to have this Court adopt the Commissioner's findings and recommendation.[125] Though not addressed in order, each objection is fully considered below. The matter is now ripe for disposition.

## STANDARD OF REVIEW

Under Rule 62(a)(5), the Commissioner is permitted to conduct hearings and submit proposed findings of fact and recommendations for the disposition of that

---

[122] State's Supplemental Response, D.I. 155, ¶¶ 14-24.
[123] Comm'r Report, at 45.
[124] *See generally* Defendant's Appeal.
[125] *See* State's Response.

motion by a judge.[126] The Court "may accept, reject or modify, in whole or in part, the findings of fact or recommendations made by the Commissioner."[127] Having received timely objections to the Commissioner's recommendations, the Court now makes a *de novo* review of "those portions of the report" to which an objection is made.[128]

## DISCUSSION

The pending Rule 61 Motion is Defendant's seventh motion, filed more than 30 years after his conviction became final. His Motion is procedurally barred unless he can establish that he is entitled to relief under Superior Court Criminal Rule 61(d)(2)(i). He must "plead[] with particularity that new evidence exists that creates a strong inference that the movant is actually innocent in fact of the acts underlying the charges of which he was convicted."[129] "The necessary showing is substantially more than the mere 'reasonable probability' necessary to show prejudice."[130]

### I.    The Actual Innocence Claim – Rule 61

"[S]atisfying the actual innocence test is, by design, a heavy burden, and such meritorious claims are exceedingly rare."[131]  To meet these requirements[132] and

---

[126] DEL. SUPER. CT. CRIM. R. 62(a)(5).
[127] *Id.* at 62(a)(5)(ii).
[128] *Id.* at 62(a)(5)(iv).
[129] *Id.* at 61(d)(2)(i).
[130] *Purnell v. State*, 254 A.3d 1053, 1098 (Del. 2021).
[131] *Id.* at 1100.
[132] Because Defendant filed his Rule 61 Motion prior to the Supreme Court's issuance of *Purnell*, the Court need not consider the applicability of other jurisdictions actual/factual innocence tests

19

satisfy the actual innocence test, the defendant must "show that his new evidence (1) is such as will probably change the result if a new trial is granted; (2) has been discovered since the trial and could not have been discovered before by the exercise of due diligence; and (3) is not merely cumulative or impeaching."[133] Therefore, the evidence must be new and persuasive.[134]

## A. The Evidence is New

Prong two focuses on the newness of the evidence. Evidence is new "where it was 'discovered since trial, and the circumstances must be such as to indicate that it could not have been discovered before trial with due diligence.'"[135] Here, the 2015 USDOJ/FBI report (that the expert testimony exceeded the limits of science) came well after Defendant's 1983 conviction. Despite the State's assertion that this evidence is only partially new, clearly this evidence could not have been discovered by Defendant before trial. Therefore, for purposes of this analysis, the newness prong is satisfied.

## B. New Evidence is Not Persuasive

Prongs one and three focus on the persuasiveness of the new evidence. As to the third prong, the State asserts briefly that the evidence would have been

---

since Delaware's requirements are fully set out under *Purnell* and where Defendant later tailored his arguments in this appeal under this applicable rubric.

[133] *Purnell*, 254 A.3d at 1100 (citing *Downes v. State*, 771 A.2d 289, 291 (Del. 2001)).

[134] *See generally id.*

[135] *Id.* at 1097 (quoting *Lloyd v. State*, 534 A.2d 1262, 1267 (Del. 1987)).

cumulative. Not necessarily. What we know today is that the testimony overstated the science. Since the errors highlighted by the 2015 report were not available in 1983, the new evidence is not cumulative. Perhaps this new evidence would have served to further rein in the expert and/or impeach him. But for purposes of further discussion, since neither side fully explored this prong, the Court accepts that the new evidence is neither cumulative nor impeaching.

Accordingly, the analysis here is limited to whether the first prong has been established. Defendant argues the new evidence meets the *Purnell* rubric for an actual innocence claim in that the misstatements of the expert "were *so probative* of identification and so central to resolving the flawed identifications by the other witnesses that it is probable a new trial would yield a different result."[136]

As to this persuasiveness prong, Defendant's ". . . burden on the motion . . . is satisfying the Court that the new evidence, when considered in the context of *all the relevant evidence* by a properly instructed jury, is such as *will* probably change the result if a new trial were granted."[137] And the "new evidence must speak with such persuasive force as to [so] convince. . . ."[138]

Defendant fails to meet his burden for three reasons: the new evidence does not carry the persuasive force so as to change this result and also acknowledged that

---

[136] Defendant's Appeal, at 41 (emphasis added).
[137] *See Purnell*, 254 A.3d at 1114 (emphasis added).
[138] *Id.* at 1100.

21

the expert's overstatements were effectively limited through cross-examination, the new evidence does not exonerate Defendant, and the remaining evidence sufficiently supports the conviction.

### 1. The Relevant Evidence of the 2015 MHC Testimony was Limited

It is undisputed that the expert testimony of Podolak included erroneous statements which the FBI report concluded "exceed[ed] the limits of science," where he "stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of all others."[139] The FBI report cited four specific times during his testimony where such errors were made.[140]

Yet, the FBI also recognized that any problematic testimony was tempered by limiting language offered throughout the expert's testimony. This limiting language included testimony that explained to the jury that MHC is "not like fingerprints; they are not a hundred percent accurate"[141] and is not a basis for "absolute personal identification," stating "the key word is 'absolute.'"[142]

---

[139] Defendant's Appendix, Microscopic Hair Comparison Analysis Result of Review, at A21.
[140] *Id.* at A23 (citing to the trial transcript of Agent Podolak's testimony the FBI concluded the following statements were inappropriate: (1) stating that the job of a hair analyst is to "try to make an association between [hair evidence] and the particular individual"; (2) likening hair comparison to that of a human face where the "uniqueness to the hair . . . allows . . . an association of that hair to a particular individual"; (3) "that the morphology of human head hairs is an individual characteristic of identity… this affirms that this is a good reliability or a very good ability of an analyst to take a questioned hair and match it to an individual in a crime situation"; and (4) that part of a person's identity is "the uniqueness of the individual's hair.").
[141] Defendant's Appendix, Trial Testimony of Agent Podolak, at A67:6-7.
[142] *Id.* at A67:8-13.

The FBI also referenced Podolak's testimony where he stated that the hairs could have originated from Defendant or from either of the sexually assaulted victims (A.S. or S.K.).[143] Podolak also testified that the origination cannot be established "with a hundred percent surety."[144] And reiterated that hair comparison analysis is not absolute.[145]

Defendant's claim that the Commissioner placed undue emphasis on this limiting language is unavailing. Nor did she minimize the effect of the expert's testimony on the jury where the record is clear that the limitations of MHC as a science were acknowledged at trial by the expert. Defendant's trial counsel effectively cross-examined him regarding these limitations and properly elicited inconsistencies in his testimony.

The jury therefore heard that hair comparison analysis was neither one hundred percent accurate nor absolute for personal identification. Considered in its totality, the impropriety of the expert's testimony lacks the requisite force to impact the State's case against Defendant.

---

[143] *Id.* at A71:10-16.
[144] *Id.* at A71:10-16.
[145] *Id.* at A74:20-75:3.

## 2. Defendant Cannot Establish That a Person Other Than Defendant Committed the Crimes

Furthermore, Defendant's burden is not met solely because he raises challenges related to the science/testimony introduced at trial in 1983. Even considering the unique circumstances under which *Purnell* was decided, the Supreme Court reminds us that to succeed on an actual innocence claim, the test "'requires new evidence that a person other than the petitioner committed the crime.'"[146] Here, there is no such evidence. The 2015 USDOJ/FBI disclosure does not so conclude, nor do the results from the supplemental 2019 retesting.

Although the FBI no longer provides expert testimony for MHC testing at trial,[147] hair comparison analysis is not a defunct science, and the FBI still conducts MHC testing, considering it scientifically valid today.[148] As was conducted here in 2019, the FBI retested the hair evidence and again concluded that Defendant was "a possible source of [the] hair."[149]

As for the supplemental 2019 mtDNA results, the Court agrees with

---

[146] *Purnell*, 254 A.3d at 1095 (quoting *State v. Milton Taylor*, 2018 WL 3199537, at *7 (Del. Super. June 28, 2018), *aff'd*, 206 A.3d 825 (Del. 2019) (TABLE)).

[147] Defendant's Appendix, Dep't of Justice and FBI Joint Statement on Microscopic Hair Analysis dated April 19, 2015, at A992.

[148] *See* FBI/DOJ Microscopic Hair Comparison Analysis Review, https://www.fbi.gov/services/laboratory/scientific-analysis/fbidoj-miscrocopic-hair-comparison-analysis-review (last visited June 10, 2022) ("It's important to note that microscopic hair comparison analysis is a valid technique still conducted by the FBI Laboratory.").

[149] *See* Appendix to State's Supplemental Response to Defendant's Motion for Postconviction Relief, at B132.

Defendant that it was incorrect for the Commissioner to reference a mtDNA "match" to Defendant since mtDNA "cannot be used to conclusively identify an individual."[150] Also true is that no conclusions can be drawn from a victim's sample that merely establishes Defendant "cannot be excluded as the source,[151] and that mtDNA evidence is not as conclusive as nuclear DNA evidence (not conducted here).[152] But Defendant's argument that the Commissioner overstated the significance of the mtDNA evidence is of little consequence where, regardless of its probative weight, the new evidence does not *establish* that someone other than Defendant committed these crimes. Therefore, Defendant fails to satisfy this requirement.

### 3. The Result Would Not Change if Limited to the Remaining Relevant Evidence

Even if the new evidence raised inferences that someone other than Defendant committed these crimes, and the expert's erroneous testimony was excluded entirely, the remaining evidence would not change the result.

### a. *Location, Victims, and Modus Operandi*

The jury was free to consider the similarities in these cases. All three victims were young women working in offices in the North Wilmington and Claymont area.

---

[150] Defendant's Appendix, FBI Laboratory Report, at A1038.

[151] *Id.* at A1037.

[152] The State reiterates that the mtDNA evidence (that Defendant could not be excluded as the source) is useful to corroborate SK's positive identification that he was her attacker.

The three attacks were temporally and geographically close to one another, occurring within a few miles of where Defendant was living with his long-time friend.

This friend's testimony established a nexus between Defendant and the offices of at least two of the victims. The jury heard that Defendant entered the office building of the third victim, returned with her checks (that the friend cashed) and the third attack occurred shortly thereafter. There was also evidence that within days of the second rape, evidence of similar thefts had occurred in that victim's office building that also tied it back to Defendant and/or his female friend.[153] And Defendant admitted that he had supported himself for years by committing such thefts in office buildings.

The jury considered the *modus operandi* of the attacks themselves. First, the assailant physically assaulted or threatened the use of force on them. In the three attacks, the assailant shoved a screwdriver into the victim's side or put his hand over the victim's mouth and limited his victims' abilities to see him by placing clothing over his or their heads. In all three, he robbed his victims by demanding and forcefully taking money and jewelry from them.

He also kidnapped them. All three victims were forcibly removed from the place of the initial encounter and taken to secluded areas within their office buildings

---

[153] A.S.'s co-worker's stolen checks were cashed during this time period and a dictating machine that matched the description of the stolen one belonging to this same co-worker was found in Defendant's friend's car.

26

to be either physically or sexually assaulted. In these assaults, two of the victims' hands and legs were tied. Two were gagged with sweaters and raped. And when the third victim was forced to her knees, the evidence suggested that it was only because she lost control of her bladder that she was not sexually assaulted.

The jury was also free to consider the independent culpability of Defendant as to each assault or whether the series of assaults were committed by one assailant. Both sexual assaults involved vaginal penetration. In both, the rapist was unable to maintain an erection or ejaculate. In two of the attacks, his victims described the assailant as having a calm, soft, or soothing voice. In all, the assailant's description is the same: a male, between 20 to 30 years old who was thin, black, and approximately 5'8" to 6'0" in stature. At trial, Defendant was 32 years old, 5'11,"[154] and twenty pounds heavier than his arrest weight of 152 pounds.[155]

Lastly, the assailant was identified as well-dressed. Defendant admitted his criminal activities took place in office buildings and his long-time friend testified that when he committed them, he dressed the part. The jury also considered that the assailant wore gray loafers during two of the attacks. The shoes were identified by more than one witness, including his friend who confirmed they belonged to Defendant.

---

[154] Comm'r Report, at 7.
[155] Defendant's Appendix, Trial Testimony of Detective Dressel, at A325:11-A326:2.

### b. *Challenges to Identification Insufficient to Change Result*

Defendant takes issue with certain witnesses' identifications, suggesting they were flawed due to the impropriety of the State's pre-trial statements made to them. For the first victim, Defendant argues it was improper for the State to inform her that it possessed evidence against a person who would be in court, and that this evidence would prove that this individual was the man who raped her.[156] This argument is without merit.

This argument stems from the cross-examination of the first witness.[157] It is reasonable for the State to represent to the victim(s) that evidence at trial is expected

---

[156] *See* Defendant's Appendix, Trial Testimony of S.K., at A171:5-12 (testifying to what she (S.K.) was told by the State).

[157] On cross-examination:

Q: Now prior to trial, I assume you have had some contact with members of the [DOJ] in regard to this case?
A. Yes.

. . .

Q. And were you not, in fact, informed that the person that was going to be tried was, in the opinion of the members of the [DOJ], the person who committed the crimes against you?
A. Yes.
Q. Weren't you told that they had evidence that showed that this was the man who raped you?
A. Yes.
Q. When you came into court today, you expected to see the person charged with this offense sitting at one of the two tables here; isn't that correct?
A. You mean —I was told they had evidence. Of course, I didn't know if I was going to walk in and it was going to look exactly like him. No, I wasn't sure until I walked in.

. . .

Q. So you came in expecting to see the person that raped you.
A. I didn't expect anything. I didn't know what to expect.
Q. But you had been told that he would be here.
A. Yes. Of course. But once I did walk in, I knew it was him." *See id.* at A170:19-A172:7.

to support a conviction against the very person sitting at the defense table. That the State is poised to present this evidence and tells a victim as much should not come as a surprise to a testifying victim. Defendant fails to establish how anything that the State may have said to her about its evidence tainted her ability to testify as to her observations during her attack or her ability to identify Defendant as the attacker. Moreover, S.K. testified unequivocally on cross examination that this statement did not influence her identification of Defendant at trial.[158] The jury was free to make credibility determinations accordingly.

Defendant's next arguments relate to the second and third attacks. These concern statements made to the second victim (A.S.) and the co-worker eyewitness (Ms. Shaw) by Chief Investigating Officer, Detective Castelline. These arguments are equally unavailing. At trial, the officer acknowledged that it would be improper for an officer to indicate who a suspect is *before* going through a photo lineup because the officers do not want to have any influence on the person's selection.[159] That is not what happened in this trial. However improper the detective's comments may have been, they had a minimal effect on the outcome of the trial, namely where the comments to both witnesses were made *after* each witness had independently selected Defendant's picture from a lineup.

---

[158] *Id.* at A174:16-A175:4.
[159] Defendant's Appendix, Trial Testimony of Detective Castelline, at A319:13-23.

With A.S., the detective indicated Defendant was the suspect *after* she had narrowed the identification of her attacker to two photos,[160] and further selected Defendant twice from two different photos of him. Dissatisfied with a composite drawing, she was able to describe features of her assailant, including for example, the hollowness of his cheeks, and communicated as much to law enforcement.[161] Yet, even after all that, she *never* positively identified Defendant as her assailant, even at trial. The most the jury heard is that Defendant resembled her attacker.

As to Ms. Shaw, Detective Castelline indicated that Defendant was a suspect *after* she positively identified him in the photo lineup.[162] This witness testified that on the morning of the third attack, she passed a man in the hallway who was exiting the office where the attack occurred,[163] described him as a neatly dressed tall black man, who stood about 5'10" and 130 pounds, approximately 30 years old, wearing a blue shirt and blue tweed pants, with glasses, and a "short to medium afro."[164] In addition to this detailed description, she positively identified him both in a photo lineup[165] and at trial.[166] Any improper statements made by Detective Castelline are

---

[160] *Id.* at A318:8-A319:12.
[161] Defendant's Appendix, Trial Testimony of A.S., at A240:9-22.
[162] Defendant's Appendix, Trial Testimony of Detective Castelline, at A450:1-6.
[163] Defendant's Appendix, Trial Testimony of Christine Shaw, at A428:13-A429:15.
[164] *Id.* at A429:4-9; A430:17-20.
[165] Defendant's Appendix, Trial Testimony of Detective Castelline, at A453:5-13.
[166] Defendant's Appendix, Trial Testimony of Christine Shaw, at A433:19-A434:5.

insufficient to diminish the weight of her detailed testimony or destroy her unequivocal identification of Defendant.

The record is replete with challenges through cross examination regarding the inconsistences related to Defendant's identification and what the witnesses did and did not see. The jury was free to weigh the credibility of these witnesses and the inconsistencies of the evidence as to identification. The State established guilt independently as to each victim and further presented the similarities that connected the series of these assaults to Defendant. Challenges to any flaws in the identification processes are without merit and insufficient to disturb the jury's verdicts.

Accordingly, Defendant fails to meet his heavy burden to satisfy the actual innocence test. Though the evidence is new, he does not meet the requirements to establish its persuasiveness. The Court is not satisfied the new evidence, when considered in the context of "*all the relevant evidence* by a properly instructed jury, is such as *will* probably change the result if a new trial were granted."[167] The new evidence fails to create a strong inference that he is actually innocent in fact of the acts underlying the charges of which he was convicted. Therefore, he is procedurally barred under Superior Court Criminal Rule 61(d)(2)(i). Accordingly, this Court

---

[167] *See Purnell*, 254 at 1114 (emphasis added).

need not reach the merits of his 14th Amendment due process claim that he was denied the right to a fair trial.[168]

## II. The Due Process Claim – Disparate Treatment

In Defendant's second constitutional claim, he argues that the Court must dismiss his indictment because the State failed to do so. Citing to *Daniels*,[169] he contends the State's failure amounts to a constitutional due process violation of disparate treatment. He asserts his remedy of dismissal should mirror that of Mr. Daniels. The State invites the Court to conduct a judicial review of the differences in these cases to support its justification for its decision to proceed as it did. The Court declines the invitation. This necessarily involves a critical review of the State's decisions to (1) proceed under Rule 48 to dismiss an indictment in one case and (2) respond under Rule 61 to defend its judgment in this one.

### A. Defendant and Daniels are not similarly situated

For background, the Court notes that the cases share some similarities, but they are by all accounts, procedurally, factually, and circumstantially distinct. Like Defendant, *Daniels* involved a "stranger-rape" case from the 1980s which involved flawed MHC testimony[170] and resulted in a conviction. Similarly, Mr. Daniels

---

[168] *See id.* at 1122 (finding the Court could "consider the impact of [the defendant's] procedurally defaulted Constitutional deprivation . . . claim" because he had satisfied the actual innocence test).

[169] *See* Brief for State of Delaware, *State v. Daniels*, ID. No. 87002394DI (Del. Super. Nov. 30, 2018) [hereinafter Daniels Motion].

[170] *See generally id.*

32

sought to have his conviction overturned after the USDOJ/FBI determined the testifying FBI agent made invalid statements while testifying about the hair evidence which exceeded the limits of science.[171] The similarities stop here.

Unlike this case, additional new evidence became available that prompted the State to direct Mr. Daniels to the Department of Justice's Actual Innocence Program, a program created by the USDOJ in 2015 to ensure that the USDOJ "is aware of, and takes corrective action with respect to, persons who are incarcerated where empirical evidence establishes their innocence."[172] When deemed ineligible for reasons not relevant here, the State took the next step of moving for dismissal under Superior Court Criminal Rule 48(a).[173]

In the State's request for dismissal of Daniels' indictment, it stated "[t]his motion is based on circumstances unique to [him]."[174] These circumstances included "double-match" MHC testimony,[175] unavailable hair evidence for additional testing, then "newly acquired" school transcripts which contradicted the identification of Mr. Daniels, and newly discovered fingerprint evidence which identified another suspect.[176]

---

[171] *Id.* at 8–9.
[172] *Id.* at 9.
[173] *See* DEL. SUPER. CT. CRIM. R. 48(a).
[174] Daniels Motion, at 1.
[175] The expert testified that he never had a double-match case, explaining the match on the panties of the victim *and* a match on the pants of the defendant could have originated from the victim as two separate matches. *Id.* at 7.
[176] *See generally id.*

Indeed, none of the unique circumstances in *Daniels* are present here. No "double-match" testimony was elicited in Defendant's trial. Here, hair evidence was available and retested. And unlike the additional new exculpatory evidence (i.e., school transcripts or fingerprints) in *Daniels*, there is nothing new that serves to challenge or question the identification of Defendant. These cases are not similarly situated.

More troubling is that this request requires this Court to investigate the rationale of an Attorney General's decision to file under Rule 48(a) in order to determine whether this Defendant can establish a due process claim under Rule 61.

## B.  Prosecutorial Discretion

It has been long held that decisions regarding whom to prosecute and for what offenses lie in the official discretion of the prosecutor.[177] Our Supreme Court has noted, "[t]his broad discretion rests largely on the recognition that the decision to prosecute is *particularly ill-suited to judicial review*."[178] "Judicial deference to the decision of these executive officers rests in part on an assessment of the relative competence of prosecutors and courts . . . [and] also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function."[179]

---

[177] *Albury v. State*, 551 A.2d 53, 61 (Del. 1988) (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 364, *reh'g denied*, 435 U.S. 918 (1978)).

[178] *State v. Wharton*, 1991 WL 138417, at *4 (Del. Super. June 3, 1991) (citing *Wayte v. United States*, 470 U.S. 598, 607 (1985) (emphasis added)).

[179] *U.S. v. Armstrong*, 517 U.S. 456, 465 (1996).

34

Though broad, prosecutorial discretion is not unfettered. The judiciary gives due deference to a prosecutor's exercise of charging discretion, unless that exercise violates equal protection or due process principles.[180] Accordingly, "[i]n Delaware, there are two situations in which a court may find that a prosecutor has abused his or her discretion over enforcement: (1) selective prosecution, which constitutes a denial of equal protection, or (2) vindictive prosecution, which constitutes a violation of due process."[181]

Defendant claims a violation of his due process rights. To raise a colorable due process claim, he must allege vindictive prosecution.[182] He fails to so allege.[183] Instead, he argues *disparate treatment*, namely that his case was handled differently from that of Mr. Daniels. As previously stated, these defendants are not similarly situated. Even if so, "[a] prosecutor is allowed broad discretion in law enforcement and is not obliged to treat two similarly situated defendants alike."[184]

To the extent this claim resonates more as an equal protection claim based on selectivity, it still fails. The conscious exercise of selectivity in enforcement is not

---

[180] *See Anderson v. State*, 21 A.3d 52, 58 (Del. 2011).

[181] *State v. Anderson*, 2010 WL 4513029, at *5 (Del. Super. Nov. 1, 2010) (citing *Albury*, 551 A.2d at 61 n.13).

[182] *Anderson*, 2010 WL 4513029, at *5 (citing *Anderson v. State*, 2010 WL 3103400, at *1 (Del. Super. June 3, 2010)).

[183] Defendant has failed to allege any facts to establish a due process violation by animus or ill will. *See Wharton*, 1991 WL 138417, at *10; *State v. Walton*, 2002 WL 126400, at *3 (Del. Super. Jan. 17, 2002).

[184] *Ward v. State*, 414 A.2d 499, 500 (Del. 1980).

35

a constitutional violation if "the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification."[185] Defendant does not allege the State consciously exercised its discretion on the basis of any unjustifiable standards nor is his claim based on a classification. Because defendant's reasons are not based on a constitutionally protected criterion,[186] the discretion cannot be judicially second-guessed.[187] The Court need not undertake further analysis.[188]

## CONCLUSION

Defendant fails to meet his heavy burden to satisfy the actual innocence test. Even if the evidence is new, he does not meet the requirements to establish its persuasiveness. Thus, he fails to create a strong inference that he is actually innocent in fact of the acts underlying the charges of which he was convicted. Therefore, he is procedurally barred under Superior Court Criminal Rule 61(d)(2)(i). As such, the Court need not consider the merits of his due process claim that he was denied the right to a fair trial.

---

[185] *State v. Anderson*, 2010 WL 4513029, at *5 (citing *Wharton*, 1991 WL 138417, at *3).
[186] Courts have long and consistently warned against a prosecutor's exercise of discretion based on impermissible factors. *See, e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) (race); *Cleveland v. Trzebuckowski*, 709 N.E.2d 1148 (Ohio 1999) (age).
[187] *See Oyler v. Boles*, 368 U.S. 448, 455–56 (1962).
[188] *See Wayte*, 470 U.S. at 608.

The Court declines to consider the due process claim of disparate treatment as it relates to the prosecutorial discretion exercised by the Delaware Department of Justice as Defendant fails to raise a colorable due process claim.

After careful consideration and *de novo* review, the Court accepts and **ADOPTS**, in whole, the Commissioner's Report and Recommendation for the reasons stated above.[190] Defendant's Appeal from the Commissioner's Finding of Fact and Recommendation is **DENIED**.

_____
Vivian L. Medinilla
Judge

oc: Prothonotary
cc: Defendant

---

[190] *See* DEL. SUPER. CT. CRIM. R. 62(a)(5)(iv) ("A judge may accept, reject, or modify, in whole or in part, the findings of fact or recommendations made by the Commissioner.").